Michigan Supreme Court
Lansing, Michigan

# Opinion

Chief Justice:          Justices:
Clifford W.             Michael F. Cavanagh
Taylor                  Elizabeth A. Weaver
                        Marilyn Kelly
                        Maura D. Corrigan
                        Robert P. Young, Jr.
                        Stephen J. Markman

FILED JULY 29, 2005

JOAN M. GLASS,

    Plaintiff-Appellant,

v                          No. 126409

RICHARD A. GOECKEL and KATHLEEN D. GOECKEL,

    Defendants-Appellees.

_____

BEFORE THE ENTIRE BENCH

CORRIGAN, J.

The issue presented in this case is whether the public has a right to walk along the shores of the Great Lakes where a private landowner ostensibly holds title to the water's edge. To resolve this issue we must consider two component questions: (1) how the public trust doctrine affects private littoral[1] title; and (2) whether the public

---

[1] Modern usage distinguishes between "littoral" and "riparian," with the former applying to seas and their coasts and the latter applying to rivers and streams. Black's Law Dictionary (7th ed). Our case law has not always precisely distinguished between the two terms. Consistent with our recognition that the common law of the

trust encompasses walking among the public rights protected by the public trust doctrine.

Despite the competing legal theory offered by Justice Markman, our Court unanimously agrees that plaintiff does not interfere with defendants' property rights when she walks within the area of the public trust. Yet we decline to insist, as do Justices Markman and Young, that submersion[2] at a given moment defines the boundary of the public trust. Similarly, we cannot leave uncorrected the Court of Appeals award to littoral landowners of a "right of exclusive use" down to the water's edge, which upset the balance between private title and public rights along our Great Lakes and disrupted a previously quiet status quo.

Plaintiff Joan Glass asserts that she has the right to walk along Lake Huron. Littoral landowners defendants

sea applies to our Great Lakes, see *People v Silberwood*, 110 Mich 103, 108; 67 NW 1087 (1896), citing *Illinois Central R Co v Illinois*, 146 US 387, 437; 13 S Ct 110; 36 L Ed 1018 (1892), we will describe defendants' property as littoral property. Although we have attempted to retain consistency in terminology throughout our discussion, we will at times employ the term "riparian" when the facts or the language previously employed so dictate. For example, a *littoral* owner of property on the Great Lakes holds *riparian* rights as a consequence of owning waterfront property. See *Hilt v Weber*, 252 Mich 198, 225; 233 NW 159 (1930).

[2] We note that, in the view of our colleagues, "submerged land" includes not only land that lies beneath visible water, but wet sands that are "infused with water." See *post* at 52.

Richard and Kathleen Goeckel maintain that plaintiff trespasses on their private land when she walks the shoreline. Plaintiff argues that the public trust doctrine, which is a legal principle as old as the common law itself, and the Great Lakes Submerged Lands Act (GLSLA), MCL 324.32501 *et seq.*,[3] protect her right to walk along the shore of Lake Huron unimpeded by the private title of littoral landowners. Plaintiff contends that the public trust doctrine and the GLSLA preserve public rights in the Great Lakes and their shores that limit any private property rights enjoyed by defendants.

Although we find plaintiff's reliance on the GLSLA misplaced, we conclude that the public trust doctrine does protect her right to walk along the shores of the Great Lakes. American law has long recognized that large bodies of navigable water, such as the oceans, are natural resources and thoroughfares that belong to the public. In our common-law tradition, the state, as sovereign, acts as trustee of public rights in these natural resources. Consequently, the state lacks the power to diminish those rights when conveying littoral property to private parties.

---

[3] The Great Lakes Submerged Lands Act, formerly MCL 322.701 *et seq.*, is now part of Michigan's Natural Resources and Environmental Protection Act, MCL 324.101 *et seq.*

3

This "public trust doctrine," as the United States Supreme Court stated in *Illinois Central R Co v Illinois,* 146 US 387, 435; 13 S Ct 110; 36 L Ed 1018 (1892) (*Illinois Central I*), and as recognized by our Court in *Nedtweg v Wallace*, 237 Mich 14, 16-23; 208 NW 51 (1926), applies not only to the oceans, but also to the Great Lakes.

Pursuant to this longstanding doctrine, when the state (or entities that predated our state's admission to the Union) conveyed littoral property to private parties, that property remained subject to the public trust. In this case, the property now owned by defendants was originally conveyed *subject to specific public trust rights in Lake Huron and its shores up to the ordinary high water mark*. The ordinary high water mark lies, as described by Wisconsin, another Great Lakes state, where "'the presence and action of the water is so continuous as to leave a distinct mark either by erosion, destruction of terrestrial vegetation, or other easily recognized characteristic.'" *State v Trudeau*, 139 Wis 2d 91, 102; 408 NW2d 337 (1987) (citation omitted).[4] Consequently, although defendants

_____

[4] We refer to a similarly situated sister state not for the entirety of its public trust doctrine, but for a credible definition of a term long employed in our jurisprudence. Despite Justice Markman's protestation over upsetting settled rules, see, e.g., *post* at 37, we have

4

retain full rights of ownership in their littoral property, they hold these rights subject to the public trust.

We hold, therefore, that defendants cannot prevent plaintiff from enjoying the rights preserved by the public trust doctrine. Because walking along the lakeshore is inherent in the exercise of traditionally protected public rights of fishing, hunting, and navigation, our public trust doctrine permits pedestrian use of our Great Lakes, up to and including the land below the ordinary high water mark. Therefore, plaintiff, like any member of the public, enjoys the right to walk along the shore of Lake Huron on land lakeward of the ordinary high water mark. Accordingly, we reverse the judgment of the Court of Appeals and remand this case to the trial court for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

Defendants own property on the shore of Lake Huron, and their deed defines one boundary as "the meander line of Lake Huron."[5] Plaintiff owns property located across the

recourse to this persuasive definition because, as noted by Justice Young, this area of law has been characterized by critical terms receiving less than precise definition. See *post* at 1.

[5] We note that the parties do not contest the terms of the deed by which defendants own their property. We take as given that defendants hold title to their property

5

highway from defendants' lakefront home. This case originally arose as a dispute over an express easement. Plaintiff's deed provides for a fifteen-foot easement across defendants' property "for ingress and egress to Lake Huron," and she asserts that she and her family members have used the easement consistently since 1967 to gain access to the lake. The parties have since resolved their dispute about plaintiff's use of that easement.

This present appeal concerns a different issue: plaintiff's right *as a member of the public* to walk along the shoreline of Lake Huron, irrespective of defendants' private title. During the proceedings below, plaintiff sought to enjoin defendants from interfering with her walking along the shoreline. Defendants sought summary disposition under MCR 2.116(C)(8) and (9), for failure to state a claim upon which relief may be granted and for failure to state a defense. Defendants argued that, as a matter of law, plaintiff could not walk on defendants' property between the ordinary high water mark and the lake without defendants' permission.

---

according to the terms of their deed. The record does not reflect any argument over the meaning of the term "meander line" in this context. The issue before us is not how far defendants' private littoral title extends, but how the public trust affects that title.

6

The trial court granted plaintiff summary disposition under MCR 2.116(I)(2). Although the court concluded that no clear precedent controls resolution of the issue, it held that plaintiff had the right to walk "lakewards of the natural ordinary high water mark" as defined by the GLSLA.

The Court of Appeals reversed the trial court's order in a published opinion. 262 Mich App 29; 683 NW2d 719 (2004). It stated "[t]hat the state of Michigan holds in trust the *submerged lands* beneath the Great Lakes within its borders for the free and uninterrupted navigation of the public . . . ." *Id*. at 42. The Court held that, apart from navigational issues, the state holds title to previously submerged land, subject to the exclusive use of the riparian owner up to the water's edge. *Id*. at 43. Thus, under the Court of Appeals analysis, neither plaintiff nor any other member of the public has a right to traverse the land between the statutory ordinary high water mark and the literal water's edge.

We subsequently granted leave to appeal. 471 Mich 904 (2004).

STANDARD OF REVIEW

We review de novo the grant or denial of a motion for summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). In a motion under MCR 2.116(C)(8),

7

"[a]ll well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant." *Maiden, supra* at 119. As we stated in *Nasser v Auto Club Ins Ass'n,* 435 Mich 33, 47; 457 NW2d 637 (1990), "a motion for summary disposition under MCR 2.116(C)(9) is tested solely by reference to the parties' pleadings."

## ANALYSIS

### I. THE HISTORY OF THE PUBLIC TRUST DOCTRINE

Throughout the history of American law as descended from English common law, our courts have recognized that the sovereign must preserve and protect navigable waters for its people. This obligation traces back to the Roman Emperor Justinian, whose *Institutes* provided, "Now the things which are, by natural law, common to all are these: the air, running water, the sea, and therefore the seashores. Thus, no one is barred access to the seashore . . . ." Justinian, *Institutes*, book II, title I, § 1, as translated in Thomas, *The Institutes of Justinian, Text, Translation and Commentary* (Amsterdam: North-Holland Publishing Company, 1975), p 65; see also 9 Powell, Real Property, § 65.03(2), p 65-39 n 2, quoting a different translation. The law of the sea, as developed through English common law, incorporated the understanding that

8

> both the title and the dominion of the sea, and of rivers and arms of the sea, where the tide ebbs and flows, and of all the lands below high water mark, within the jurisdiction of the Crown of England, are in the King. Such waters, and the lands which they cover, either at all times, or at least when the tide is in, are incapable of ordinary and private occupation, cultivation and improvement; and their natural and primary uses are public in their nature, for highways of navigation and commerce, domestic and foreign, and for the purpose of fishing by all the King's subjects. Therefore the title, *jus privatum,* in such lands . . . belongs to the King as the sovereign; and the dominion thereof, *jus publicum,* is vested in him as the representative of the nation and for the public benefit. [*Shively v Bowlby*, 152 US 1, 11; 14 S Ct 548; 38 L Ed 331 (1894).]

This rule—that the sovereign must sedulously guard the public's interest in the seas for navigation and fishing—passed from English courts to the American colonies, to the Northwest Territory, and, ultimately, to Michigan. See *Nedtweg, supra* at 17; accord *Phillips Petroleum Co v Mississippi*, 484 US 469, 473-474; 108 S Ct 791; 98 L Ed 2d 877 (1988), quoting *Shively, supra* at 57.

Michigan's courts recognized that the principles that guaranteed public rights in the seas apply with equal force to the Great Lakes. Thus, we have held that the common law of the sea applies to the Great Lakes. See *Hilt v Weber*, 252 Mich 198, 213, 217; 233 NW 159 (1930); *People v Silberwood*, 110 Mich 103, 108; 67 NW 1087 (1896). In particular, we have held that the public trust doctrine

from the common law of the sea applies to the Great Lakes.[6]
See *Nedtweg, supra* at 16-23; *Silberwood, supra* at 108;
*State v Venice of America Land Co*, 160 Mich 680, 702; 125
NW 770 (1910); accord *Illinois Central I, supra* at 437.

Accordingly, under longstanding principles of
Michigan's common law, the state, as sovereign, has an
obligation to protect and preserve the waters of the Great
Lakes and the lands beneath them for the public.[7] The state
serves, in effect, as the trustee of public rights in the
Great Lakes for fishing, hunting, and boating for commerce
or pleasure. See *Nedtweg, supra* at 16; *Venice of America
Land Co, supra* at 702; *State v Lake St Clair Fishing &*

---

[6] In this decision, we consider the public trust
doctrine only as it has applied to the Great Lakes and do
not consider how it has applied to inland bodies of water.

[7] Although not implicated in this case, we note that
the Great Lakes and the lands beneath them remain subject
to the federal navigational servitude. This servitude
preserves for the federal government control of all
navigable waters "for the purpose of regulating and
improving navigation . . . ." *Gibson v United States*, 166
US 269, 271-272; 17 S Ct 578; 41 L Ed 996 (1897).
"[A]lthough the title to the shore and submerged soil is in
the various States and individual owners under them, it is
always subject to the servitude in respect of navigation
created in favor of the Federal government by the
Constitution." *Id*. at 272. Apart from this servitude, the
federal government has relinquished to the state any
remaining ownership rights in the Great Lakes. See 43 USC
1311.

*Shooting Club*, 127 Mich 580, 586; 87 NW 117 (1901); *Lincoln v Davis*, 53 Mich 375, 388; 19 NW 103 (1884).

The state, as sovereign, cannot relinquish this duty to preserve public rights in the Great Lakes and their natural resources. As we stated in *Nedtweg, supra* at 17:

> The State may not, by grant, surrender such public rights any more than it can abdicate the police power or other essential power of government. But this does not mean that the State must, at all times, remain the proprietor of, as well as the sovereign over, the soil underlying navigable waters. . . . The State of Michigan has an undoubted right to make use of its proprietary ownership of the land in question, [subject only to the paramount right of] the public [to] enjoy the benefit of the trust.

Therefore, although the state retains the authority to convey lakefront property to private parties, it necessarily conveys such property *subject to the public trust*.

At common law, our courts articulated a distinction between *jus privatum* and *jus publicum* to capture this principle: the alienation of littoral property to private parties leaves intact public rights in the lake and its submerged land. See *Nedtweg*, *supra* at 20; *McMorran Milling Co v C H Little Co*, 201 Mich 301, 313; 167 NW 990 (1918); *Sterling v Jackson*, 69 Mich 488, 506-507; 37 NW 845 (1888) (Campbell, J., dissenting); see also *Collins v Gerhardt*,

11

237 Mich 38, 55; 211 NW 115 (1926) (Fellows, J., concurring) (recognizing the "different character" of the rights held by the federal government as proprietor and as trustee in an inland navigable stream); *Lorman v Benson*, 8 Mich 18, 27-28 (1860) (reciting the common-law distinction between *jus publicum* and *jus privatum* in a case involving ownership of a riverbed).[8]

*Jus publicum* refers to public rights in navigable waters and the land covered by those waters;[9] *jus privatum,* in contrast, refers to private property rights held subject

---

[8] Indeed, other states also recognize the distinction between private title and public rights. See, e.g., *State v Longshore*, 141 Wash 2d 414, 427; 5 P3d 1256 (2000) ("The state's ownership of tidelands and shorelands is comprised of two distinct aspects--the *jus privatum* and the *jus publicum*."); *Smith v State*, 153 AD2d 737, 739-740; 545 NYS2d 203 (1989) ("This doctrine grows out of the common-law concept of the *jus publicum,* the public right of navigation and fishery which supersedes a private right of *jus privatum*.") (citations omitted); *Bell v Town of Wells*, 557 A2d 168, 172-173 (Me, 1989) (stating that the different types of title in the same shore property "remain in force" to this day); see also *R W Docks & Slips v State*, 244 Wis 2d 497, 509-510; 628 NW2d 781 (2001) (applying the public trust doctrine as adopted in its state constitution).

[9] See Black's Law Dictionary (7th ed), defining "*jus publicum*" as "[t]he right, title, or dominion of public ownership; esp., the government's right to own real property in trust for the public benefit."

to the public trust.[10]  As the United States Supreme Court explained in *Shively, supra* at 13:

> In England, from the time of Lord Hale, it has been treated as settled that the title in the soil of the sea, or of arms of the sea, below the ordinary high water mark, is in the King, except so far as an individual or a corporation has acquired rights in it by express grant or by prescription or usage; and that this title, *jus privatum*, whether in the King or in a subject, is held subject to the public right, *jus publicum,* of navigation and fishing.  [Citations omitted.]

Thus, when a private party acquires littoral property from the sovereign, it acquires only the *jus privatum*.  Our courts have continued to recognize this distinction between private title and public rights when they have applied the public trust doctrine.  Public rights in certain types of access to the waters and lands beneath them remain under the protection of the state.  Under the public trust doctrine, the sovereign never had the power to eliminate those rights, so any subsequent conveyances of littoral property remain subject to those public rights.  See *Nedtweg, supra* at 17; see also *People ex rel Director of Conservation v Broedell*, 365 Mich 201, 205; 112 NW2d 517 (1961).  Consequently, littoral landowners have always

---

[10]  See *id.,* defining "*jus privatum*" as "[t]he right, title, or dominion of private ownership."

13

taken title subject to the limitation of public rights preserved under the public trust doctrine.

## II. THE SCOPE OF THE PUBLIC TRUST DOCTRINE

Having established that the public trust doctrine is alive and well in Michigan, we are required in this appeal to examine the *scope* of the doctrine in Michigan: whether it extends up to the ordinary high water mark or whether, as defendants argue, it applies only to land that is *actually* below the waters of the Great Lakes at any particular moment.

### A. THE GREAT LAKES SUBMERGED LANDS ACT

Plaintiff argues that the Legislature defined the scope of the public trust doctrine and established the outer limits of the doctrine in the GLSLA, thus supplanting our case law. This act, according to plaintiff, manifests a legislative intent to claim all land lakeward of the ordinary high water mark. Thus, plaintiff claims that the public trust extends to all land below the ordinary high water mark as defined in the act, which states that "the ordinary high-water mark shall be at the following elevations above sea level, international Great Lakes datum of 1955: Lake Superior, 601.5 feet; Lakes Michigan and Huron, 579.8 feet; Lake St. Clair, 574.7 feet; and Lake Erie, 571.6 feet." MCL 324.32501.

14

We find plaintiff's reliance on the GLSLA to be misplaced. First, the act does not show a legislative intent to take title to all land lakeward of the ordinary high water mark. MCL 324.32502 provides:

> The lands covered and affected by this part are all of the unpatented lake bottomlands and unpatented made lands in the Great Lakes, including the bays and harbors of the Great Lakes, belonging to the state or held in trust by it, including those lands that have been artificially filled in. The waters covered and affected by this part are all of the waters of the Great Lakes within the boundaries of the state. This part shall be construed so as to preserve and protect the interests of the general public in the lands and waters described in this section, to provide for the sale, lease, exchange, or other disposition of unpatented lands and the private or public use of waters over patented and unpatented lands, and to permit the filling in of patented submerged lands whenever it is determined by the department that the private or public use of those lands and waters will not substantially affect the public use of those lands and waters for hunting, fishing, swimming, pleasure boating, or navigation or that the public trust in the state will not be impaired by those agreements for use, sales, lease, or other disposition. The word "land" or "lands" as used in this part refers to the aforesaid described unpatented lake bottomlands and unpatented made lands and patented lands in the Great Lakes and the bays and harbors of the Great Lakes lying below and lakeward of the natural ordinary high-water mark, but this part does not affect property rights secured by virtue of a swamp land grant or rights acquired by accretions occurring through natural means or reliction. For purposes of this part, the ordinary high-water mark shall be at the following elevations above sea level, international Great Lakes datum of 1955: Lake Superior, 601.5 feet; Lakes Michigan and Huron,

15

579.8 feet; Lake St. Clair, 574.7 feet; and Lake Erie, 571.6 feet.

The first sentence of this section states that the act applies only to "unpatented lake bottomlands" and "unpatented made lands." The fourth sentence, however, defines "land" or "lands" in the act as including not only the bottomlands and made lands described in the first sentence, but also "patented lands in the Great Lakes and the bays and harbors of the Great Lakes lying below and lakeward of the natural ordinary high-water mark . . . ."[11] Thus, the act covers both publicly owned land (the lake bottomlands and made lands described in the first sentence) and privately owned land that was once owned by the state (patented land below the ordinary high water mark). In other words, the act reiterates the state's authority as trustee of the inalienable *jus publicum*, which extends over both publicly and privately owned lands. The act makes no claims to alter the delineation of the *jus privatum* of individual landowners.

Moreover, the act never purports to establish the boundaries of the public trust. Rather, the GLSLA establishes the scope of the regulatory authority that the

---

[11] A land patent is "[a]n instrument by which the government conveys a grant of public land to a private person." Black's Law Dictionary (7th ed), p 1147.

Legislature exercises, pursuant to the public trust doctrine. Indeed, most sections of the act merely regulate the use of land below the ordinary high water mark.[12] The only section of the act that purports to deal with property rights is § 32511, MCL 324.32511:

> A riparian owner may apply to the department for a certificate suitable for recording indicating the location of his or her lakeward boundary or indicating that the land involved has accreted to his or her property as a result of natural accretions or placement of a lawful, permanent structure. The application shall be accompanied by a fee of $200.00 and proof of upland ownership.

---

[12] Section 32503 provides that the Department of Environmental Quality (DEQ) may enter into agreements regarding land use or alienate unpatented land to the extent that doing so will not impair "the public trust in the waters . . . ." MCL 324.32503. Section 32504 governs applications for deeds or leases to unpatented lands. MCL 324.32504. Section 32504a concerns the restoration and maintenance of lighthouses. MCL 324.32504a. Section 32505 covers unpatented lake bottomlands and unpatented made lands, again providing that such lands may be conveyed as long as the public trust "will not be impaired or substantially injured." MCL 324.32505. Sections 32506 through 32509 concern the valuation of unpatented lands and various administrative matters (with § 32509 delegating authority to promulgate rules to the DEQ). MCL 324.32506 through 324.32509. Section 32510 establishes that a violation of the act is a misdemeanor punishable by imprisonment or a fine. MCL 324.32510. Prohibited acts are defined in § 32512, MCL 324.32512, with § 32512a, MCL 324.32512a, specifically focusing on the removal of vegetation. Sections 32513 and 32514 return to administrative matters, such as applications for permits and public notice of hearing. MCL 324.32513 and 324.32514. Section 32515, MCL 324.32515, deals with enlargement of waterways, and § 32516, MCL 324.32516, returns again to the removal of vegetation.

As shown previously, a vital distinction in public trust law exists between private title (*jus privatum*) and those public rights that limit that title (*jus publicum*). Section 32511 only establishes a mechanism for landowners to certify the boundary of their private property (*jus privatum*). The boundary of the public trust (*jus publicum*)—distinct from a boundary on private littoral title—remains a separate question, a question that the act does not answer.

Finally, plaintiff also relies on the following language in § 32502 to argue that the GLSLA establishes the scope of the public trust doctrine:

> This part [the GLSLA] shall be construed so as to preserve and protect the interests of the general public in the lands and waters described in this section, to provide for the sale, lease, exchange, or other disposition of unpatented lands and the private or public use of waters over patented and unpatented lands, and to permit the filling in of patented submerged lands whenever it is determined by the department that the private or public use of those lands and waters will not substantially affect the public use of those lands and waters for hunting, fishing, swimming, pleasure boating, or navigation or that the public trust in the state will not be impaired by those agreements for use, sales, lease, or other disposition.[13]

---

[13] MCL 324.32502.

Again, plaintiff's reliance on this section is misplaced. This sentence states that the act will be construed to protect the public interest. But that rule of construction begs the question and cannot resolve whether the public has an interest in a littoral property in the first place. It provides no reason to expand the public trust beyond the limits established at common law. Thus, we must look elsewhere to determine the precise scope of the public trust to which § 32502 refers.[14]

B. THE PUBLIC TRUST DOCTRINE AS APPLIED TO THE GREAT LAKES

Because the GLSLA does not define the scope of the public trust doctrine in Michigan, we must turn again to our common law.

In applying the public trust doctrine to the oceans, courts have traditionally held that rights protected by this doctrine extend from the waters themselves and the lands beneath them to a point on the shore called the

---

[14] The Legislature has recognized the public trust in other contexts as well. As early as 1913, the Legislature had made provision for the disposition and preservation of the public trust by entrusting trust lands and waters to the care of the predecessor of the DEQ. See 1913 PA 326, 1915 CL 606 *et seq.*; see also *Nedtweg, supra* at 18, 20 (upholding the constitutionality of the act because any authorized uses would yield to the "rights of the public"). In addition, the Legislature has conveyed small fractions of the lakes and shoreline to private parties, though only after ensuring that such conveyances did not disturb the public trust. See, e.g., 1954 PA 41; 1959 PA 31; 1959 PA 84.

19

"ordinary high water mark."   See, e.g., *Shively, supra* at 13; *Hardin v Jordan*, 140 US 371, 381; 11 S Ct 808; 35 L Ed 428 (1891); see also Hargrave's Law Tracts, 11, 12, quoted in *Shively, supra* at 12 ("'The shore is that ground that is between the ordinary high water and low water mark [and this ground belongs to the sovereign.]'").   The United States Supreme Court described this common-law concept of the "high water mark" in *Borax Consolidated, Ltd v Los Angeles,* 296 US 10, 22-23; 56 S Ct 23; 80 L Ed 9 (1935):

> The tideland extends to the high water mark. This does not mean . . . a physical mark made upon the ground by the waters; it means the line of high water as determined by the course of the tides. By the civil law, the shore extends as far as the highest waves reach in winter. But by the common law, the shore "is confined to the flux and reflux of the sea at ordinary tides." It is the land "between ordinary high and low-water mark, the land over which the daily tides ebb and flow. When, therefore, the sea, or a bay, is named as a boundary, the line of ordinary high-water mark is always intended where the common law prevails."  [Citations omitted.]

An "ordinary high water mark" therefore has an intuitive meaning when applied to tidal waters.  Because of lunar influence, ocean waves ebb and flow, thus reaching one point on the shore at low tide and reaching a more landward point at high tide.  The latter constitutes the high water mark on a tidal shore.  The land between this mark and the low water mark is submerged on a regular

20

basis, and so remains subject to the public trust doctrine as "submerged land."  See, e.g., *Illinois Central R Co v Chicago*, 176 US 646, 660; 20 S Ct 509; 44 L Ed 622 (1900) (*Illinois Central II*) ("But it is equally well settled that, in the absence of any local statute or usage, a grant of lands by the State does not pass title to *submerged lands below [the] high water mark . . . .*" (Citations omitted; emphasis added.)

Michigan's courts have adopted the ordinary high water mark as the landward boundary of the public trust.  For example, in an eminent domain case concerning property on a bay of Lake Michigan, we held that public rights end at the ordinary high water mark.  *Peterman v Dep't of Natural Resources*, 446 Mich 177, 198-199; 521 NW2d 499 (1994).[15] Thus, we awarded damages for destruction of the plaintiff's property above the ordinary high water mark that resulted from construction by the state (which occurred undisputedly in the water and within the public trust).  *Id*.  Similarly, in an earlier case where the state asserted its control under the public trust doctrine over a portion of littoral

---

[15] This decision relied not simply on a "navigational servitude" unique to that case, but rooted that "navigational servitude" in the public trust doctrine.  See *id*. at 194 n 22, citing *Collins*, *supra* at 45-46; *Venice of America Land Co*, *supra*; *Nedtweg*, *supra* at 16-17.

property, the Court also employed the high water mark as the boundary of the public trust. *Venice of America Land Co, supra* at 701-702.

Our Court has previously suggested that Michigan law leaves some ambiguity regarding whether the high or low water mark serves as the boundary of the public trust. See *Broedell, supra* at 205-206. But the established distinction in public trust jurisprudence between public rights (*jus publicum*) and private title (*jus privatum*) resolves this apparent ambiguity. Cases that seem to suggest, at first blush, that the public trust ends at the low water mark actually considered the boundary of the littoral owner's private property (*jus privatum*) rather than the boundary of the public trust (*jus publicum*).[16]

---

[16] See *La Porte v Menacon*, 220 Mich 684; 190 NW 655 (1922) (resolving a dispute between private landowners over a deed term and bounding property at the low water mark); *Lake St Clair Fishing & Shooting Club, supra* at 587, 594-595 (setting the boundary of private title at the low water mark, while simultaneously endorsing *Shively* and *Illinois Central I* and *II*); *Silberwood, supra* at 107 (reciting the holdings of other jurisdictions that a riparian owner's fee ends at the low water mark); *Lincoln, supra* at 384 (considering the boundaries of a grant made by the federal government, rather than the boundary on what the government retained). In *Collins, supra* at 60 (Fellows, J., concurring), our Court differed and used the *high* water mark as the boundary to private title, but that case involved property on an *inland stream*.

In *People v Warner*, 116 Mich 228, 239; 74 NW 705 (1898), the Court appeared to place a single boundary

22

Because the public trust doctrine preserves public rights separate from a landowner's fee title, the boundary of the public trust need not equate with the boundary of a landowner's littoral title.  Rather, a landowner's littoral title might extend past the boundary of the public trust.[17]

---

between the riparian owner's title and state control, stating that "[t]he adjoining proprietor's fee stops [at the high or low water mark], and there that of the State begins."  Yet this boundary marks "the limit of private ownership."  *Id*.  This recalls the fact that the state might hold proprietary title or, separate from that title, title as trustee to preserve the waters and lands beneath them on behalf of the public.  The Court proceeded to distinguish the state's interest in the waters from the interest of the public in navigation, fish, and fowl.  *Id*. Thus, in context, the *Warner* Court recognized a boundary on a riparian title, a title that remained subject to the public trust.  But the Court did not equate that boundary with the limit of the public trust.

[17] Although in the context of an inland stream case, Justice Fellows noted the possibility of different boundaries on the public trust and riparian ownership in his concurring opinion in *Collins*, *supra* at 52, quoting *Bickel v Polk*, 5 Del 325, 326 (Del Super, 1851):

> "The right of fishing in all public streams where the tide ebbs and flows, is a common right, and the owner of land adjoining tide water, though his title runs to low water mark, has not an exclusive right of fishing; the public have the right to take fish below high water mark, though upon soil belonging to the individual, and would not be trespassers in so doing; but if they take the fish above high water mark, or carry them above high water mark and land them on private property, this would be a trespass . . . .  In all navigable rivers, where the tide ebbs and flows, the people have of common right the privilege of fishing, and of navigation, between

Our case law nowhere suggests that private title necessarily ends where public rights begin. To the contrary, the distinction we have drawn between private title and public rights demonstrates that the *jus privatum* and the *jus publicum* may overlap.

Nor does this recognition of the potential for overlap represent a novel invention. While not binding on Michigan, other courts have similarly accommodated the same practical challenge of fixing boundaries on shifting waters: they acknowledged the possibility of public rights coextensive with private title. See, e.g., *State v Korrer*, 127 Minn 60, 76; 148 NW 617 (1914) (Even if a riparian owner holds title to the ordinary low water mark, his title is absolute only to the ordinary high water mark and the intervening shore space between high and low water mark remains subject to the rights of the public.); see also *North Shore, Inc v Wakefield*, 530 NW2d 297, 301 (ND, 1995) (stating that neither the state nor the riparian owner held absolute interests between high and low water mark); *Shaffer v Baylor's Lake Ass'n, Inc*, 392 Pa 493, 496; 141 A2d 583 (1958) (subjecting private title held to low water mark to public rights up to high water mark); *Flisrand v*

---

high and low water mark; though it be over private soil."

24

*Madson*, 35 SD 457, 470-472; 152 NW 796 (1915) (same as *Korrer, supra*); *Bess v Humboldt Co*, 3 Cal App 4th 1544, 1549; 5 Cal Rptr 2d 399 (1992) (noting that it is "well established" that riparian title to the low water mark remained subject to the public trust between high and low water marks).

In the instant case, the Court of Appeals relied extensively on *Hilt* to set a boundary on where defendants' property ended and where plaintiff's rights (as a member of the public) began. But our concern in *Hilt* was the boundary of a littoral landowner's *private* title,[18] rather than the boundary of the public trust. See *Hilt, supra* at 206 (noting that the government conveyed title "to the water's edge"). Indeed, the *Hilt* Court endorsed the *Nedtweg* Court's discussion of the public trust and decided the issue of the boundary on private littoral title within the context of the public trust doctrine. See *id*. at 203, 224-225, 227.[19] Consequently, the Court of Appeals erred by

_____

[18] Moreover, the particular issue in *Hilt* was the boundary of private title on *relicted/accreted* land, which is not at issue in the present case.

[19] The *Hilt* Court concluded by stating how the public trust doctrine affected a riparian owner's private title:

> While the upland owner, in a general way, has full and exclusive use of the relicted land, his enjoyment of its use, especially his freedom

granting defendants an exclusive right of use down to the water's edge, because littoral property remains subject to the public trust and because defendants hold title according to the terms of their deed.

Our public trust doctrine employs a term, "the ordinary high water mark," from the common law of the sea and applies it to our Great Lakes. While this term has an obvious meaning when applied to *tidal* waters with regularly recurring high and low tides, its application to *nontidal* waters like the Great Lakes is less apparent. See, e.g., *Lincoln*, *supra* at 385 (noting, amidst a discussion of the extent of private littoral title, some imperfection in an analogy between the Great Lakes and the oceans). In the Great Lakes, water levels change because of precipitation, barometric pressure, and other forces that lack the regularity of lunar tides, which themselves exert a less noticeable influence on the Great Lakes than on the oceans. Applying a term from the common law of the sea, despite the obvious difference between the oceans and the Great Lakes,

_____

to develop and sell it, is clouded by the lack of fee title, the necessity of resorting to equity or to action for damages instead of ejectment to expel a squatter, and the overhanging threat of the State's claim of right to occupy it for State purposes. The State, except for the paramount trust purposes, could make no use of the land . . . . [*Id.* at 227.]

has led to some apparent discontinuity in the terminology employed in our case law. Notwithstanding some prior imprecision in its use, a term such as "ordinary high water mark" attempts to encapsulate the fact that water levels in the Great Lakes fluctuate. This fluctuation results in temporary exposure of land that may then remain exposed above where water currently lies. This land, although not immediately and presently submerged, falls within the ambit of the public trust because the lake has not permanently receded from that point and may yet again exert its influence up to that point. See *Nedtweg*, *supra* at 37 (setting apart from the public trust that land which is permanently exposed by the "recession of water" and so "rendered suitable for human occupation"). Thus, the ordinary high water mark still has meaning as applied to the Great Lakes and marks the boundary of land, even if not instantaneously submerged, included within the public trust. Our sister state, Wisconsin, defines the ordinary high water mark as

> the point on the bank or shore up to which the presence and action of the water is so continuous as to leave a distinct mark either by erosion, destruction of terrestrial vegetation, or other easily recognized characteristic. And where the bank or shore at any particular place is of such a character that is impossible or difficult to ascertain where the point of ordinary high-water mark is, recourse may be had to other places on

27

> the bank or shore of the same stream or lake to
> determine whether a given stage of water is above
> or below ordinary high-water mark. [*Diana
> Shooting Club v Husting*, 156 Wis 261, 272; 145 NW
> 816 (1914), (citation omitted).]

Although *Diana Shooting Club* involved a river, Wisconsin has applied this definition not only to inland waters, but also to the Great Lakes. See *R W Docks & Slips*, *supra* at 508-510; *Trudeau*, *supra* at 102.[20] This definition has long served a state with which we share a border and that also has an extensive Great Lakes shoreline.

Although we do not import our sister state's public trust doctrine where this Court has already spoken, we are persuaded to adopt this definition to clarify a term long used but little defined in our jurisprudence. Indeed, Wisconsin's definition of ordinary high water mark is not

---

[20] While an average member of the public may not require this degree of precision, *Trudeau* illustrates how a factual dispute over the location of the ordinary high water mark may be resolved. In that case, the parties presented evidence via expert witnesses. *Id*. at 108. For example, the state's expert testified that he "analyzed several aerial photographs . . . , the government survey maps, the site's present configuration, and stereo [three-dimensional] photographs . . . ." *Id*. Numerous resources exist to provide guidance to professionals. See, e.g., Simpson, *River & Lake Boundaries: Surveying Water Boundaries—A Manual* (Kingman, AZ: Plat Key Publishing, 1994); Cole, *Water Boundaries* (New York: J Wiley & Sons, 1997). Not surprisingly, this Court requires a survey based on proper monuments to establish an actual property line. *Hurd v Hines*, 346 Mich 70, 78-79; 77 NW2d 341 (1956). The same requirement would apply for a boundary set by one of our Great Lakes.

far removed from meanings previously recognized in Michigan. See MCL 324.30101(i);[21] 1999 AC, R 281.301(j); *Peterman*, *supra* at 198 n 29 (noting a statutory definition regarding inland waters, now enacted as MCL 324.30101(i), when considering the ordinary high water mark on Lake Michigan). This definition also parallels that employed by the federal government. See, e.g., 33 CFR 328.3(e).[22] Thus, we clarify the meaning of "ordinary high water mark" consistently with a definition that has served another

---

[21] Enacted after the GLSLA employed a standard based on International Great Lakes Datum for the Great Lakes, MCL 324.30101(i), which contains definitions previously found in the former Inland Lakes and Streams Act, in relevant part provides:

"Ordinary-high water mark" means the line between upland and bottomland that persists through successive changes in water levels, below which the presence and action of the water is so common or recurrent that the character of the land is marked distinctly from the upland and is apparent in the soil itself, the configuration of the surface of the soil, and the vegetation.

[22] 33 CFR 328.3(e) provides:

The term ordinary high water mark means that line on the shore established by the fluctuations of water and indicated by physical characteristics such as clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the

29

Great Lakes state for some hundred years and is in accord with the term's limited development in our own state.

The concepts behind the term "ordinary high water mark" have remained constant since the state first entered the Union up to the present: boundaries on water are dynamic and water levels in the Great Lakes fluctuate.[23] In light of this, the aforementioned factors will serve to identify the ordinary high water mark, but the precise location of the ordinary high water mark at any given site on the shores of our Great Lakes remains a question of fact.

### III. The Public Trust Includes Walking within its Boundaries

We have established thus far that the private title of littoral landowners remains subject to the public trust beneath the ordinary high water mark. But plaintiff, as a

---

[23] As our Court has consistently recognized, water boundaries necessarily defy static definition. See *Hilt*, *supra* at 219. For example, the common law recognized riparian rights to accretion and reliction. This meant that riparian landowners gained private title to land adjacent to their property that gradually became permanently exposed through erosion or a change in water level. See *Peterman*, *supra* at 192-193. The recognition of these riparian rights shows that our courts have refused to fix a line that defies natural processes. Also, the concept of a "moveable freehold" to accommodate the effects of accretion and reliction on the bounds of littoral title shows our acknowledgement of the shifting nature of water boundaries. See *id.*, *Klais v Danowski*, 373 Mich 262, 275-276; 129 NW2d 414 (1964), and *Broedell*, *supra* at 206, all quoting *Hilt*, *supra* at 219.

member of the public, may walk below the ordinary high water mark only if that practice receives the protection of the public trust doctrine. We hold that walking along the shore, subject to regulation (as is any exercise of public rights in the public trust) falls within the scope of the public trust.

To reiterate, the public trust doctrine serves to protect resources—here the waters of the Great Lakes and their submerged lands—shared in common by the public. See pp 9-11 of this opinion; see also *Venice of America Land Co*, *supra* at 702 (noting that "the State of Michigan holds these lands in trust for the use and benefit of its people"). As trustee, the state must preserve and protect specific public rights below the ordinary high water mark and may permit only those private uses that do not interfere with these traditional notions of the public trust. See *Obrecht v Nat'l Gypsum Co*, 361 Mich 399, 412-413; 105 NW2d 143 (1960). Yet its status as trustee does not permit the state, through any of its branches of government, to secure to itself property rights held by

31

littoral owners.  See *Hilt, supra* at 224 ("The state must be honest.").[24]

We first note that neither party contests that walking falls within public rights traditionally protected under our public trust doctrine.  Rather, they dispute where, not whether, plaintiff may walk:  below the literal water's edge or below the ordinary high water mark.  While the parties' agreement on this point cannot determine the scope of public rights, this agreement does indicate the existence of a common sense assumption:  walking along the lakeshore is inherent in the exercise of traditionally protected public rights.

Our courts have traditionally articulated rights protected by the public trust doctrine as fishing, hunting, and navigation for commerce or pleasure.  See *Nedtweg, supra* at 16; *Venice of America Land Co, supra* at 702; *Lake*

---

[24] For example, in *Hilt, supra* at 225, we noted several riparian rights held by landowners whose property abuts water.  These riparian rights include the "[u]se of the water for general purposes, as bathing, domestic use, etc. [,] . . . wharf[ing] out to navigability [,] . . . [a]ccess to navigable waters [, and] . . . . [t]he right to accretions."  (Citations omitted.)  Moreover, "[r]iparian rights are property, for the taking or destruction of which by the State compensation must be made, unless the use has a real and substantial relation to a paramount trust purpose."  *Id.*; see also *Peterman, supra* at 191.  Thus, we have long recognized the value of riparian rights, but those rights remain ever subject to the "paramount" public trust.

*St Clair Fishing & Shooting Club*, *supra* at 586; *Lincoln*, *supra* at 388.[25]

In order to engage in these activities specifically protected by the public trust doctrine, the public must have a right of passage over land below the ordinary high water mark. Indeed, other courts have recognized a "right of passage" as protected with their public trust. See *Town of Orange v Resnick*, 94 Conn 573, 578; 109 A 864 (1920) (listing as public rights "fishing, boating, hunting, bathing, taking shellfish, gathering seaweed, cutting sedge and . . . passing and repassing"); *Arnold v Mundy*, 6 NJL 1, 12 (1821) (reserving to the public the use of waters for "purposes of passing and repassing, navigation, fishing, fowling, [and] sustenance").

We can protect traditional public rights under our public trust doctrine only by simultaneously safeguarding activities inherent in the exercise of those rights. See e.g., *Attorney General, ex rel Director of Conservation v Taggart*, 306 Mich 432, 435, 443; 11 NW2d 193 (1943) (permitting wading in a stream pursuant to the public trust

---

[25] Indeed, we have even noted that the public might cut ice or, in the context of inland waters, might float logs downriver. See *Lake St Clair Fishing & Shooting Club*, *supra* at 587; *Grand Rapids Booming Co v Jarvis*, 30 Mich 308, 319 (1874).

doctrine).  Walking the lakeshore below the ordinary high water mark is just such an activity, because gaining access to the Great Lakes to hunt, fish, or boat required walking to reach the water.[26]  Consequently, the public has always held a right of passage in and along the lakes.

Even before our state joined the Union, the Northwest Ordinance of 1787, art IV, protected our Great Lakes in trust:  "The navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free . . . ."  See Northwest Ordinance of 1787, art IV.  Given that we must protect the Great Lakes as "common highways," see *id.*, we acknowledge that our public trust doctrine permits pedestrian use–in and of itself–of our Great Lakes, up to and including the land below the ordinary high water mark.

Yet in *Hilt*, *supra* at 226, our Court noted the rule stated by the Wisconsin Supreme Court in *Doemel v Jantz*, 180 Wis 225; 193 NW 393 (1923):  "[T]he public has no right of passage over dry land between low and high-water mark but the exclusive use is in the riparian owner . . . ."  When read in context, this quotation does not represent a

---

[26] This does not imply a right of lateral access in the public, i.e., a right to traverse the land of littoral owners to reach the lands and waters held in trust.  See, e.g., *Collins*, *supra* at 49.

34

rejection of walking as impermissible within our public trust. As correctly described by Justice Markman, the *Hilt* Court cited this passage as part of its discussion regarding the Michigan Supreme Court's correction of an earlier departure from the common law.[27] See *post* at 51-53. But rather than adopting that rule from *Doemel*, the *Hilt* Court listed this rule, among others, to refute the notion that the state held "substantially absolute title" in the lakes and the lands beneath them. *Hilt, supra* at 224. Instead, "the State has title in its sovereign capacity," *id.,* pursuant to the public trust doctrine. Consequently, "the right of the State to use the bed of the lake, except for the trust purposes, is subordinate to that of the riparian owner." *Id*. at 226, citing *Town of Orange, supra* at 578. In light of this exception for the public trust, littoral owners' rights supersede public rights in the same property (by virtue of their ownership) only to the extent that littoral owners' rights do not contravene the public trust. See *id*. When the *Hilt* Court recognized the greater

---

[27] The *Kavanaugh* cases departed from the common law by fixing the meander line as the boundary on private littoral title and by fixing the legal status of land below that line, regardless of subsequent physical changes. See *Hilt, supra* at 213; see also *Kavanaugh v Rabior*, 222 Mich 68; 192 NW 623 (1923); *Kavanaugh v Baird*, 241 Mich 240; 217 NW 2 (1928).

35

rights of littoral property owners, it did not alter the public trust or preclude the public from walking within it.

We must conclude with two caveats. By no means does our public trust doctrine permit *every* use of the trust lands and waters. Rather, this doctrine protects only limited public rights, and it does not create an unlimited public right to access private land below the ordinary high water mark. See *Ryan v Brown*, 18 Mich 196, 209 (1869). The public trust doctrine cannot serve to justify trespass on private property. Finally, any exercise of these traditional public rights remains subject to criminal or civil regulation by the Legislature.

IV. RESPONSE TO OUR COLLEAGUES

Our Court unanimously agrees that defendants cannot prevent plaintiff from walking along the shore of Lake Huron within the area of the public trust. Despite the separate theory that undergirds the analysis, Justices Markman and Young agree with the majority that plaintiff may walk along Lake Huron in the area of the public trust.

Moreover, the majority and our colleagues agree on several other points. We agree that the public trust doctrine, descended at common law, applies to our Great Lakes. See *Hilt*, *supra* at 202 ("[T]his Court has consistently held that the State has title in fee in trust

36

for the public to submerged beds of the Great Lakes within its boundaries."). We further agree that the public trust doctrine requires the state as trustee to preserve public rights in the lakes and lands submerged beneath them. See *Nedtweg*, *supra* at 16. Finally, we agree that plaintiff retains the same right to walk along the Great Lakes she has always held. *Post* at 50-52. That our colleagues disagree with the other members of this Court over the particulars of how far those public rights extend ought not overshadow our fundamental agreement: plaintiff does not interfere with defendants' property rights when she walks within the public trust.

Despite the sound and fury of Justice Markman's concurring and dissenting opinion,[28] we do not radically depart from our precedents or destabilize property rights by upholding and applying our common law. While our

---

[28] For example, Justice Markman predicts the appearance of fences along the shore. Yet to the extent that landowners may do as they see fit on their own property, they could always erect a fence. While we share Justice Markman's desire to preserve any "long coexist[ence] in reasonable harmony," *post* at 2 n 2, we find peculiar his implication that resolving an actual instance of disharmony between these parties or correcting the lower court's departure from our common law equates with this Court's endorsement of (or even comment on) property owners using fences. Were we to adopt our colleagues' approach, littoral landowners could place fences as far down as the water's edge.

colleagues in dissent claim to maintain the status quo, they do not do so. Rather, the majority retains and clarifies the status quo. The trial court correctly permitted plaintiff to walk lakeward of the ordinary high water mark. The Court of Appeals also correctly recognized the importance of the public trust doctrine, though we reverse its requirement that plaintiff walk only where water currently lies.

Yet our colleagues in dissent would repeat this error by continuing to grant an exclusive right of possession to littoral landowners. Indeed, they would compound this error by granting littoral landowners all property down to where unsubmerged land ends, which they locate at the water's edge,[29] regardless of the terms of landowners'

---

[29] Numerous states bound their public trust, not at an instantaneously defined "water's edge," but at their high water mark. See, e.g., *Barboro v Boyle*, 119 Ark 377, 385; 178 SW 378 (1915) (high water mark for a lake); *Simons v French*, 25 Conn 346, 352-353 (1856) (high water mark on tidal waters); *Day v Day*, 22 Md 530, 537 (1865) (high water mark on tidally influenced rivers and streams); *State v Florida Natural Properties, Inc*, 338 So 2d 13, 19 (Fla, 1976) (ordinary high water mark); *Freeland v Pennsylvania R Co*, 197 Pa 529, 539; 47 A 745 (1901) (ordinary high water mark); *Allen v Allen*, 19 RI 114, 115; 32 A 166 (1895) (high water mark); *State v Hardee*, 259 SC 535, 541-542; 193 SE2d 497 (1972) (high water mark on tidally influenced stream).

Indeed, references in other states to "water's edge" often tie that term to either a high or low water mark. See, e.g., *Concord Mfg Co v Robertson*, 66 NH 1, 19-21; 25 A 718 (1889); *Lamprey v State*, 52 Minn 181, 198; 53 NW 1139

deeds.[30] We would not so casually set aside the countless deeds that order property rights for the length of our state shoreline. We would not give away to littoral landowners the absolute title to public trust land preserved for the people. Such a departure would represent a grave disturbance to the property rights of littoral landowners and of the public.

Notwithstanding Justice Markman's characterization of this case as "aberrational," *post* at 4, 5, and 65, we have not invented the dispute presented to us. Nor do we have the luxury of forsaking public rights; our Court is one of the "sworn guardians of Michigan's duty and responsibility as trustee of the [Great Lakes]." See *Obrecht*, *supra* at 412. For the reasons described earlier in the opinion, we conclude that public rights may overlap with private title. Consequently, we refuse to enshrine-for the first time in our history-a solitary boundary between them. In this way,

_____

(1893); *Hazen v Perkins*, 92 Vt 414, 419-421; 105 A 249 (1918); Mont Code, § 70-16-201; ND Cent Code, § 47-01-15.

[30] In the absence of a review of the myriad deeds by which landowners hold title to property on the Great Lakes, Justice Markman assumes that their deeds will describe, in some manner, the "water's edge." Yet, as he acknowledges, that water's edge may shift. This could result in water reaching above the low water mark, even though a deed could convey title to the low water mark. See, e.g., *La Porte v Menacon,* 220 Mich 684, 687; 190 NW 655 (1922) (enforcing a deed that extended private title to the "shore," meaning the "water's edge at its lowest mark").

39

we preserve littoral title as landowners have always held it, and we preserve public rights always held by the state as trustee.

In dissent, our colleagues resist acknowledging the boundary of the public trust as the ordinary high water mark. To reach this conclusion, Justice Markman relies on cases concerning the boundary of *private title*, rather than the boundary of the public trust. See e.g., *Silberwood; Lake St Clair Hunting & Fishing; Hilt*.[31] He refuses to accept our Court's holding—in a case involving Lake Michigan—that "'the limit of the public's right is the ordinary high water mark . . . .'" *Peterman, supra* at 198 (citation omitted).[32] Although he criticizes the majority

---

[31] Justice Markman makes frequent reference to colonial cases, particularly relying on Massachusetts. But as that state's high court has made clear, at common law the state owned to the mean high water line subject to public rights in navigation and fishing. See *Opinion of the Justices to the House of Representatives*, 365 Mass 681, 684-685; 313 NE2d 561 (1974). What the court described as the colonial ordinance of 1641 to 1647 changed the common law to allow private title to the low water mark, but even that extended title remained subject to public rights. *Id*. Unlike Massachusetts, no colonial ordinance altered the common-law concepts in Michigan.

[32] In seeming contradiction to his reading of *Peterman*, Justice Markman does accept that "the 'ordinary high water mark' is simply the outside edge of property that may . . . be regulated to preserve future navigational interests at times of high water . . . ." *Post* at 29. He also goes so far as to suggest that our Court has equated the high and

for vagueness with regard to the definition of that term,[33] we clarify the meaning of that term in a way that allows for the fact-specific inquiry necessary to account for the range of physical forces and variety of landforms along our shoreline.[34]  We decline to draw, merely for a charade of clarity, a universal line along the Great Lakes without any factual development of the point in the instant case or

---

low water marks, see *post* at 55, but the *Warner* Court on which he relies did not address that issue.  *Warner, supra* at 239 ("If the absence of tides upon the Lakes, or their trifling effect if they can be said to exist, practically makes high and low water mark identical for the purpose of determining boundaries (a point we do not pass upon), the limit of private ownership is thereby marked.").

Additionally, our precedent stands in contradiction to Justice Young's intuition that the ordinary high water mark has no application in Michigan.  See, e.g., *Peterman, supra* at 198-199 (calculating damages, at least in part, on the basis of the location of the ordinary high water mark).  In contrast, the "wet sand" standard supported by Justice Young appears for the first time in our state in this case. We have serious reservations about adopting the view that he joins Justice Markman in advancing.  See *post* at 49-51.

[33] In apparent tension with his claim that the majority fails to rely on Michigan common law, Justice Markman purports to offer an authoritative definition for ordinary high water mark that derives from a federal case and a 1997 dictionary.  See *post* at 41-42 & n 35.

[34] We are unpersuaded that Justice Markman's recitation of natural forces demonstrates a difficulty in ascertaining the ordinary high water mark, because those same forces operate to shift the "water's edge."  See *post* at 43-48. If anything, the results of this scientific expedition show the complexity of arriving at a water-tight definition, rather than prove that the "water's edge" concept escapes similar difficulties.

legal argument on an issue of significance to our state's jurisprudence.

Nor does our colleagues' "water's edge" concept provide superior clarity. Although the term might intuitively appear to mean where the water meets land, Justice Markman expands the term to include sand dampened by water. See, e.g., *post* at 50 ("Because by definition such sands are infused with water, the wet sands fall within the definition of 'submerged lands.'"). Our colleagues' conception of "water's edge" neglects to account for (1) geography where sand is absent; (2) sudden changes in water levels such as storm surges; (3) what degree of dampness suffices: that identified by touch, sight, or a scientific review that could identify the presence of a single water molecule; and (4) the source of the water, where dampness may arise because of contact with a liquid, such as rain, other than water from the Great Lakes. Also, the instant-by-instant determination of a property boundary affords little certainty to littoral landowners. Given these serious difficulties in applying our colleagues' "water's edge" rule *and* the absence of support in our case law, we refuse to shift the boundary on the public trust away from the ordinary high water mark.

As trustee, the state has an obligation to protect the public trust. The state cannot take what it already owns. Because private littoral title remains subject to the public trust, no taking occurs when the state protects and retains that which it could not alienate: public rights held pursuant to the public trust doctrine.[35] Certainly, the loss of littoral property or riparian rights could result from an unconstitutional taking. See, e.g., *Peterman, supra* at 198, 208 (compensating the plaintiffs for losses above the ordinary high water mark); see also *Bott v Natural Resources Comm,* 415 Mich 45, 80; 327 NW2d 838 (1982); *Hilt, supra* at 225. Yet, here, defendants have not lost any property rights. Rather, they retain their property subject to the public trust, just as all property that abuts the Great Lakes in Michigan remains subject to the public trust, pursuant to our common law.

---

[35] The United States Supreme Court has held that the issue before us is a matter of state property law. See *Phillips Petroleum Co v Mississippi*, 484 US 469, 475; 108 S Ct 791; 98 L Ed 2d 877 (1988) ("[T]he individual States have the authority to define the limits of the lands held in public trust and to recognize private rights in such lands as they see fit."); see also *Shively, supra* at 40 ("[T]he title and rights of riparian or littoral proprietors in the soil below high water mark of navigable waters are governed by the local laws of the several States, subject, of course, to the rights granted to the United States by the Constitution.").

Justice Markman also criticizes the majority for leaving unanswered many questions, several of which require the adoption of the legal framework that he proposed. Yet this case raises none of the questions that Justice Markman poses. In general, we reserve the judgment of this Court for "actual cases and controversies" and do not "declare principles or rules of law that have no practical legal effect in the case before us . . . ." *Federated Publications, Inc v City of Lansing*, 467 Mich 98, 112; 649 NW2d 383 (2002). Accordingly, we decline to rule on issues that are not before us.

## V. CONCLUSION

We conclude that plaintiff, as a member of the public, may walk the shores of the Great Lakes below the ordinary high water mark. Under longstanding common-law principles, defendants hold private title to their littoral property according to the terms of their deed and subject to the public trust. We therefore reverse the judgment of the Court of Appeals and remand this case to the trial court for further proceedings consistent with this opinion.

Maura D. Corrigan
Clifford W. Taylor
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

JOAN M. GLASS,

    Plaintiff-Appellant,

v                                                          No. 126409

RICHARD A. GOECKEL AND KATHLEEN D. GOECKEL,

    Defendants-Appellees.

_____

YOUNG, J. (*concurring in part and dissenting in part*).

This case poses a deceptively simple question: where, if anywhere, can a member of the public walk on the private beach of one of our Great Lakes without trespassing on a lakefront (littoral) owner's property?

Although the question is simple, the answer, as amply demonstrated by the more than one hundred pages of the rival opinions filed in this case, is muddled by an abstruse body of precedent that has been less than precise in defining critical terms and issues. This was a well-briefed and argued case that has resulted in a vigorous debate within the Court. The opinions of the majority and Justice Markman present compelling, principled, but *competing* constructions of an ambiguous body of Michigan law and that of other jurisdictions concerning Great Lakes

property rights.  In the final analysis, I believe that answer offered by Justice Markman is more firmly anchored than that of the majority in the admittedly obscure property law of the Great Lakes.

I concur in the majority's determination that the Great Lakes Submerged Lands Act (GLSLA), MCL 324.32501 *et seq.,* does not create a right to walk the shores of our Great Lakes.  The Act plainly evinces the Legislature's intent to regulate the use of land below what the International Great Lakes Datum identifies as the "ordinary high water mark," rather than to define new public rights or limit established property rights.[1]

However, I join Justice Markman's opinion with respect to the other issues presented by this appeal.  Like Justice Markman, I believe the majority errs by recognizing a right that we have never before recognized-the right to "walk" the private beaches of our Great Lakes- and by granting public access to private shore land up to an ill-defined and utterly chimerical "ordinary high water mark" as described in the majority opinion.[2]

---

[1] See *ante* at 14-19.
[2] See *ante* at 19-30. The majority concedes that: "Applying a term [ordinary high water mark] from the common law of the sea, despite the obvious difference between the oceans and the Great Lakes, has lead to some apparent discontinuity in the terminology employed in our case law."

To be sure, the majority's opinion constitutes a concerted and honest effort to give coherence to a very vague body of precedent. However admirable the majority's effort, I remain convinced that the "ordinary high water mark" concept on which the majority relies applies only to tidal waters, with their regularly recurring high and low tides.[3] The only "water mark" that one can find on the Great Lakes is the water's edge—*viz.,* the wet portion of the shore over which the lake is presently ebbing and flowing. I believe it is only in this area of wet shoreline that the public may walk. They may do so, not because of a recognized "right to walk" the otherwise private beaches of our Great Lakes, for no such "right" has ever been recognized previously to be a part of Michigan's public trust doctrine.[4] Nor, in my view, is the public's

---

*Ante* at 26-27. Precisely so. In effort to employ a term that does not adequately reflect the physical realities of our Great Lakes, the majority has borrowed definitions variously from statutes and Wisconsin cases in a struggle to make this tidal term fit where it does not, and in so doing, has immeasurably expanded the scope of the public trust.

[3] See *post* at 31-35.

[4] Until today, Michigan cases have only recognized the right of the public to use the public trust for navigation, hunting, fishing, and fowling. See, e.g., *Hilt v Weber,* 252 Mich 198, 224; 233 NW 159 (1930); *Collins v Gerhardt,* 237 Mich 38, 46; 211 NW 115 (1926); *State v Lake St Clair*

opportunity to walk the shoreline a product of an overlap between private and public property titles as the majority asserts. Rather, I believe that the littoral landowner has no property claim to assert over submerged land—land over which the waters of a Great Lake is presently ebbing and flowing and which constitutes the lake bed. This area is the outer boundary of the public trust that is owned by and maintained for the People of Michigan.

The difficulty of the majority's rule and the soundness of Justice Markman's approach is evident when one actually tries to apply their different standards to the shore. In the attached photograph,[5] an area of darker, wet sand forms the outer boundary of the lake bed. The water is presently acting on this portion of the beach, as evidenced by the fact that the land is waterlogged. Under Justice Markman's view and my own, it is only in this area that the public may walk, and it may do so because the land is *presently* subject to reinundation and is part of the

*Fishing & Shooting Club,* 127 Mich 580, 586; 87 NW 117 (1901).

[5] Photograph by David Hansen, Minnesota Agricultural Experiment Station, University of Minnesota. Reproduced with permission.

lake bed. Thus, in the photograph, both the seagull and the
beach walker are within the public trust.[6]



Where, however, lies the majority's "ordinary high
water mark" in this photograph?  Presumably, the majority
would identify the point where sand gives way to vegetation
in the upper right-hand corner of the picture.  The lake
water is nowhere near that point now and, absent a storm,
the water is unlikely to reach that point any time in the
near future.  Even if the lake did rise to meet the
vegetation line due to extremely high precipitation or

---

[6] Accordingly, I would hold that plaintiff may walk in
the zone of wet sands on Lake Huron, provided that she does
so without creating a nuisance, because the defendants have
no property interests in the bed of that lake.

powerful barometric forces, in what sense would the line of vegetation be an *ordinary* high water mark in the sense suggested by the majority's definition?

Moreover, the majority notes that its ordinary high water mark excludes all dry land except that "temporar[ily] expos[ed]"[7] by the water. The pictorial beach illustration shows how unsatisfactory is the majority's formulation of its definition of "ordinary high water mark" as applied to our Great Lakes: What exactly does the majority mean by "temporary" exposure? If it simply means land from which the lake waters have "not permanently receded,"[8] at what point may anyone determine that the recession of the water is "permanent"? If the portion of the shore between the lake bed (including the wet sand area over which the lake is presently lapping) and the vegetation line has been dry for a season or more, can it truly be argued that this area of the beach is "*temporarily*" exposed? These are apparently pure questions of fact for the majority,[9] but I believe they are critical threshold questions that must be posed and answered when giving the term "ordinary high

_____

[7] *Ante* at 27.

[8] *Ante* at 27.

[9] *Ante* at 30.

6

water mark" a workable legal definition as applied to the Great Lakes.

In essence, then, I believe that the majority concludes that the dry sandy area in the attached picture is entirely below the "ordinary high water mark" (thus within the protected, state-owned public trust) because this area *looks* like it may have been subject to the influence of water at some unidentifiable point in the past and because it may again, at some unidentifiable point in the future, be covered by the lake. If nothing else, this is an impractical proposition because it requires the uncritical application to our nontidal Great Lakes of a term—the "ordinary high water mark"—that is applicable *only* to tidal waters.

I believe the analysis offered by Justice Markman is more persuasive than that offered by the majority. In my view, not only has Justice Markman analyzed the applicable common law decisions with greater accuracy but, in contrast with the majority opinion, he has articulated a rule that is both faithful to the physical realities of our Great Lakes and consonant with the available confused precedent that we have all valiantly struggled to decipher.[10]

---

[10] If we must transform the term "ordinary high water mark" in order to use it, I believe that we ought at least

7

For these reasons, I concur in part II(A) of the majority opinion but join parts I-III and V of Justice Markman's opinion in respectfully dissenting from the remainder of the majority opinion.

Robert P. Young, Jr.

---

define and apply it in a way that reflects the physical nature of our non-tidal Great Lakes and that does least damage to heretofore stable lakefront property rights in the State.

# STATE OF MICHIGAN

## SUPREME COURT

JOAN M. GLASS,

    Plaintiff-Appellant,

v                                  No. 126409

RICHARD A. GOECKEL AND KATHLEEN D. GOECKEL,

    Defendants-Appellees.

_____

MARKMAN, J. (*concurring in part* and *dissenting*).

Because I would not alter the longstanding status quo in our state concerning the competing rights of the public and lakefront property owners, I respectfully dissent. In concluding that the "public trust doctrine" permits members of the public to use unsubmerged lakefront property up to the "ordinary high water mark," the majority creates new legal rules in Michigan out of whole cloth by adopting Wisconsin law in piecemeal fashion and discarding Michigan rules that have defined the relationship between the public and lakefront property owners for virtually the entirety of our state's history.[1] Equally troubling, the majority

---

[1] Although, quite remarkably, the majority purports that it "retains and clarifies the status quo," *ante* at 38, there is not a scintilla of support for the proposition

replaces clear and well-understood rules-- rules that have produced reasonable harmony over the decades in Michigan-- with obscure rules.  One of the few things that is clear about the majority's opinion is that it will lead inevitably to more litigation-- more litigation in an area of the law that, mercifully, has been largely free from such litigation for the past century and a half in our state.  In the place of the reasonable harmony that has developed between the public and littoral property owners, there will be litigation.  In the place of open beaches, there almost certainly will be a proliferation of fences erected by property owners determined to protect their now uncertain rights.[2]  In the place of rules that have *both*

---

that Wisconsin law has ever been the law of Michigan, not a single Michigan case referencing the majority's new test, and not a paragraph of argument in any of the briefs of plaintiffs, defendants, or amici identifying Wisconsin law as the law of Michigan.

[2] The majority fails to recognize why its new rules are a prescription for fences.  It is, of course, true that a lakefront property owner "could always erect a fence," as the majority observes.  *Ante* at 37 n 28.  However, fences have not heretofore generally been thought necessary. Under current law, which I would not alter, members of the public and lakefront property owners have long coexisted in reasonable harmony.  It is the majority's actions today in departing from our precedents and creating new and vague law that will almost certainly transform this relationship and cause at least some property owners to believe that they must erect fences in order to protect boundaries that now have been called into question and that apparently will

upheld the property rights of lakefront landowners and provided an environment in which reasonable public use of lakefront property, including beach-walking, could routinely take place, the majority introduces new rules that will create tensions between the public and lakefront property owners.  In the place of a boundary that can be determined by simple observation, the majority's new rules would require property owners and the public to bring "aerial photographs," a "government survey map[]" and "stereo [three-dimensional] photographs," *ante* at 28 n 20, in order to determine where their rights begin and end.  In the place of rules in which property rights have been clearly defined by law, the majority expands the "public trust" in an uncertain fashion, in accordance with rules and regulations to be issued at some future time by the administrative agencies of state government.  In the place of the clear rule of law in which property rights have been respected in a consistent fashion for more than a century and a half, there will be political dispute and negotiation.

This is the *first* such dispute to come before this Court in our history.  Rather than recognizing the harmony

be subject to definition by the Department of Natural Resources.

3

that has been produced by the present rules in the course of the millions of interactions that occur each year between the public and property owners along the Great Lakes, the majority instead creates new rules on the basis of an isolated and aberrational dispute between the present parties.

The majority departs from the longstanding status quo in our state, despite the following: (1) there is no realm of the law in which there is a greater need to maintain stability and continuity than with regard to property rights; (2) the parties in this case have all asserted that they favor a maintenance of the status quo;[3] (3) there is no

---

[3] Plaintiff argues that use of the term "'water's edge' [in *Hilt v Weber,* 252 Mich 198; 233 NW 159 (1930)] is consistent with the nomenclature of many other state and federal cases using 'water's edge' to mean 'high water mark.'" Plaintiff's brief at 24. See, also, amicus brief of the Tip of the Mitt Watershed Council at 18; amicus brief of the Michigan Senate Democratic Caucus at 2; amicus brief of the Michigan Land Use Institute at 10; and amici brief of the Michigan Departments of Environmental Quality and Natural Resources at 11. Defendants argue that the status quo gives the littoral owner "exclusive use of the beachfront to the water's edge as it exists from time to time." Defendants' brief at 13. See, also, amici brief of the Michigan Chamber of Commerce, National Federation of Independent Business Legal Foundation, Michigan Bankers Association, and Michigan Hotel, Motel & Resort Association at 11 ("The relevant Michigan authorities thus compel the conclusion that the public trust applies only to submerged lands when they are actually submerged"); amici brief of the Save our Shoreline and the Great Lakes Coalition, Inc at 9 ("[t]hat the water's edge was the boundary between

evidence that the status quo has not reasonably balanced the interests of property owners and the public in Michigan for more than a century and a half; and (4) there is no evidence that the present dispute is anything other than an isolated and aberrational dispute, not one upon which to predicate the reversal of a century-and-a-half-old conception of private property rights.

This Court has recognized the importance of maintaining the security of private property by "declar[ing] that stare decisis is to be strictly observed where past decisions establish 'rules of property' that induce extensive reliance." *Bott v Natural Resources Comm,* 415 Mich 45, 77-78; 327 NW2d 838 (1982). In *Bott,* we noted that "[j]udicial 'rules of property' create value, and the passage of time induces a belief in their stability that generates commitments of human energy and capital." *Id.* at 78. Therefore, such rules should be closely respected and overturned only for "the very best of reasons." See, e.g., *Dolby v State Hwy Comm'r*, 283 Mich 609, 615; 278 NW 694

public and [littoral] ownership was first suggested in [*La Plaisance*]"); amici brief of the legislators at 4 (arguing that numerous Michigan cases establish that littoral owners "have *title* to their property to the water's edge, free of any public trust interest in the submerged lands of the Great Lakes"); and amicus brief of the Defenders of Property Rights at 12 (noting that in the past sixty-four years, this Court has rejected any attempt to expand public rights to areas landward of the water's edge).

(1938); *Lewis v Sheldon*, 103 Mich 102, 103; 61 NW 269 (1894).

The public's right to use property abutting the Great Lakes under the public trust doctrine has traditionally been limited to "submerged lands," i.e., those lands covered by the Great Lakes, including their wet sands. The "water's edge" is that point at which wet sands give way to dry sands, thus marking the limit of the public's rights under the public trust doctrine. This has been the rule in our state since this Court's decision in *Hilt v Weber*, 252 Mich 198; 233 NW 159 (1930), a case that for seventy-five years has defined the limits of the public's rights of use of littoral property.[4] Indeed, except for the seven-year period immediately preceding *Hilt*, this water's edge principle is consistent with Michigan case law dating back over 160 years and probably even earlier. Lakefront

---

[4] As noted by the majority, "[o]ur case law has not always precisely distinguished" between the terms "littoral" and "riparian." *Ante* at 1 n 1. The former applies to oceans, seas, the Great Lakes, and their coasts, while the latter applies to rivers and streams. Black's Law Dictionary (7th ed). Unfortunately, the misuse of these terms appears to at times have led this Court to misapply aspects of the public trust doctrine as they relate to rivers and streams as if those aspects also related to the Great Lakes. See, e.g., *Peterman v Dep't of Natural Resources*, 446 Mich 177, 195; 521 NW2d 499 (1994). I will use the term "littoral" when discussing property abutting the Great Lakes.

6

property owners, including businesses,[5] have invested in reliance on present rules concerning the relationship between the public and lakefront property owners. This reliance on longstanding rules should have given the majority considerable pause before it altered the status quo and redefined the public trust doctrine.

This is not the first time this Court has upset settled rules of property on the Great Lakes, but the lessons of the first time do not seem to have been well-learned by the majority. Before the 1920s, property owners believed that their title extended to the water's edge. Steinberg, *God's terminus: Boundaries, nature, and property on the Michigan shore*, 37 Am J Legal Hist 65, 72 (1993). However, in the *Kavanaugh* cases,[6] this Court abruptly

---

[5] In particular, the consequences of the majority's new rules are uncertain for those in the tourism industry in Michigan who have invested in reliance on the rule set forth in *Hilt*. The majority, in using the "ordinary high water mark" as "defined" under Wisconsin law, has opened to public use unsubmerged lands up to a wholly unspecified point landward of the water and this change would seem to have implications for the ability of at least some Great Lakes tourists to enjoy the type of tranquil retreat offered by private beaches within Michigan. See, generally, the amici brief of the Michigan Chamber of Commerce, National Federation of Independent Business Legal Foundation, Michigan Bankers Association, and Michigan Hotel, Motel & Resort Association.

[6] *Kavanaugh v Rabior*, 222 Mich 68; 192 NW 623 (1923), and *Kavanaugh v Baird*, 241 Mich 240; 217 NW 2 (1928).

7

overruled eighty years of then-existing case law and held that a littoral owner's title extended only to the "meander line," a survey line used by the federal government to determine the amount of property available for sale in the Michigan Territory.[7] While this Court recognized at the time that this decision was "against the overwhelming weight of authority,"[8] unlike the majority's decision today, it was at least arguably grounded in dictum from a prior Michigan decision.[9] Nevertheless, by deviating from an established rule of property rights in favor of establishing a boundary at an imaginary line that property owners could not easily identify, the *Kavanaugh* cases threw Michigan's lakeshores into disarray. For example, renters of property between the meander line and the water's edge withheld their rent and in fact were advised to do so by the director of the Department of Conservation. *Id.* at 77-78. Further, littoral owners found that third parties were building on property between the meander line and the

---

[7] *Hilt, supra* at 204-205.

[8] *Baird, supra* at 252.

[9] In *Ainsworth v Munoskong Hunting & Fishing Club,* 159 Mich 61, 64; 123 NW 802 (1909), we stated that "[littoral] owners along the Great Lakes own only to the meander line . . . ." Later, however, in *Hilt, supra* at 207, we noted that in *Ainsworth*, the meander line and water's edge were the same on the bay in question.

water's edge, thus effectively blocking their access to the lake. Other littoral owners were forced to hire surveyors in order to determine with any certainty what property they actually owned. The chaos caused by the departure from the traditional rule in the *Kavanaugh* cases was so dramatic that just seven years later this Court corrected its error and reestablished the rules of property as they had existed on the Great Lakes for at least the prior eighty years. *Hilt, supra* at 227.

The majority today revamps the public trust doctrine on the basis of *Wisconsin* law-- or at least on the portions of it that the majority finds to their liking-- and, in so doing, announces new rules of law regarding lands subject to the public trust doctrine. Because I believe that the public's rights under the doctrine have always been limited to the use of submerged lands, which includes the wet sands, I do not believe that the Court of Appeals erred in holding that the public may not walk on unsubmerged lands. However, I do believe the Court of Appeals erred in holding that the state's title begins at the "ordinary high water mark." Therefore, I would affirm in part and reverse in part the decision of the Court of Appeals and remand to the trial court to apply the principles set forth in this opinion.

## I.   MISUNDERSTANDING THE "ORDINARY HIGH WATER MARK"

The majority concludes that the "ordinary high water mark" is the landward boundary of the public trust doctrine.[10]   While the majority does not necessarily disagree that the water's edge serves as the boundary of the littoral owner's title, it would expand the public's legal right to use property up to the utterly indiscernible "'point on the bank or shore up to which the presence and action of the water is so continuous as to leave a distinct mark either by erosion, destruction of terrestrial vegetation, or other easily recognized characteristic.'" *Ante* at 27 (citation omitted).   The majority further adds that this newly described "ordinary high water mark," one never before seen in Michigan, includes unsubmerged lands that are the product of "fluctuation" in the level of the lake that "results in temporary exposure of land that may

---

[10]   The majority also creates a new rhetorical formulation for the test determining whether a use is permitted by the public trust doctrine, although I fail to see any significant distinction between a use that is "inherent in the exercise of traditionally protected public rights," *ante* at 32, and a use that bears "a real and substantial relation to a paramount trust purpose." *Hilt, supra* at 225.   I agree with the majority that beach-walking is a permissible public trust use.   Walking in submerged lands is an activity that bears a "necessary and substantial relation" to other water-borne recreational activities protected by the doctrine, e.g., boating, swimming, and fishing.

10

then remain exposed above where water currently lies." *Id*. I disagree. The majority replaces a workable and easily identifiable boundary with one whose exact location is anyone's guess and it has done so on the basis of the *Wisconsin* public trust doctrine, or at least that part of Wisconsin's doctrine that supports the majority's new rule.[11] Instead, I believe that the public's entitlement to use property under the public trust doctrine of Michigan is limited to submerged lands, i.e., the Great Lakes and their wet sands.

The majority's creation of this new rule is rooted in its misunderstanding of the importance of the "ordinary high water mark" for the purpose of defining the boundary of the public trust on the nontidal Great Lakes. The public trust doctrine in the United States is derived from the English common law, which extended to tidal land below

---

[11] Curiously, the majority adopts Wisconsin law in this area, despite the fact that Wisconsin's 820 miles of Great Lakes shoreline is dwarfed by the 3,288 miles of shoreline in this state. <http://www.michigan.gov/deq/0,1607,7-135-3313_3677-15959--,00.html> (accessed June 24, 2005). Nonetheless, the critical point is not whether it is the law of a state with a longer or shorter shoreline than Michigan's that has been adopted by the majority. Rather, it is why *any* new law has been adopted when current law has proven workable for many decades of our state-- clearly setting forth the rights of the public and the property owner, minimizing litigation, and simultaneously protecting private property rights while allowing reasonable public use of the Great Lakes, including beach-walking.

the ordinary high water mark. *Borax Consolidated, Ltd v Los Angeles*, 296 US 10, 23; 56 S Ct 23; 80 L Ed 9 (1935). The rights protected by the English common law included use of tidal lands up to the ordinary high water mark for "navigation and commerce . . . and for the purposes of fishing . . . ." *Shively v Bowlby*, 152 US 1, 11; 14 S Ct 548; 38 L Ed 331 (1894).

Following the American Revolution, the title held for the public trust by the King passed to the states, subject only to those rights surrendered by the states to the federal government. *Id.* at 14-15. While each state is required to protect the uses permitted by the public trust doctrine, *Illinois Central R Co v Illinois,* 146 US 387, 453; 13 S Ct 110; 36 L Ed 1018 (1892) *(Illinois Central I)*, the scope of property subject to that trust is governed by "the local laws of the several States . . . ."[12] *Shively,*

---

[12] The majority also notes that in *Illinois Central R Co v Chicago*, 176 US 646, 660; 20 S Ct 509; 44 L Ed 622 (1900) *(Illinois Central II)*, the United States Supreme Court found that "a grant of lands by the State does not pass title to submerged lands below high-water mark . . . ." However, as stated in *Shively,* the scope of lands subject to the public trust is determined by state law. In determining the scope of the trust doctrine in *Illinois Central II*, the United States Supreme Court looked to "the law of the State of Illinois, as laid down by the Supreme Court . . . ." *Id.* at 659. In finding that Illinois's title went to the high water mark, the point emphasized by the majority, the United States Supreme Court cited

*supra* at 40.  Thus, it cannot be said that the American public trust doctrine uniformly extends to the "ordinary high water mark."  *Id.*  While a majority of the original thirteen colonies followed the English common-law rule, *Shively* noted that four of the original colonies held that the littoral owner holds title to the "low water mark," subject only to the public's right to use the water for navigation and fishing when it is above that point.  *Id.* at 18-25.[13]  For example, in *Commonwealth v Alger*, 61 Mass 53, 70 (1851), the Supreme Court of Massachusetts held, under

---

Illinois case law directly.  *Id.* at 660, citing *Seaman v Smith*, 24 Ill 521 (1860), *People ex rel Attorney General v Kirk*, 162 Ill 138, 146; 45 NE 830 (1896), and *Revell v People*, 177 Ill 468, 479; 52 NE 1052 (1898).  Because *Illinois Central II* applied Illinois law, its holding regarding the scope of lands subject to the public trust doctrine is not binding on this Court.  Rather, the common law as developed in *this* state determines the scope of lands subject to the doctrine.

[13] Those states are: Massachusetts, *Shively, supra* at 18-19 (littoral owner takes title in fee to the low water mark "subject to the public rights of navigation and fishery"); New Hampshire, *id.* at 20 ("a right in the shore has been recognized to belong to the owner of the adjoining upland"); Pennsylvania, *id.* at 23 ("the owner of lands bounded by navigable water has the title in the soil between high and low water mark, subject to the public right of navigation"); and Virginia, *id.* at 24-25 ("the owner of land bounded by tide waters has the title to ordinary low water mark, and the right to build wharves, provided they do not obstruct navigation").

the "local laws" of that state,[14] a littoral owner's title extends to the low water mark. However, the littoral owner's title is limited because "whilst [lands above the low water mark] are covered with the sea, all other persons have the right to use them for the ordinary purposes of navigation." *Id.* at 74-75. In other words, the public's rights under the public trust doctrine are limited to the use of property that is *currently* submerged. Thus, the public trust doctrine as defined in the "low water mark" colonies restricts the public's right of use to either land below the low water mark or to such land as is currently covered by the waters of the ocean.[15]

Likewise, the "local laws" of Michigan did not adopt the English definition of public trust lands, but rather restricted the public's rights under the public trust doctrine to the use of submerged lands. In *La Plaisance*

---

[14] As noted by the majority, *ante* at 40 n 31, Massachusetts adopted the low water mark by colonial ordinance. *Alger*, *supra* at 66. Thus, while obviously not directly applicable to the public trust doctrine in Michigan, *Alger* does make clear that the "ordinary high water mark" has not been as universally accepted as the majority apparently believes.

[15] In light of the majority's reliance on Wisconsin law, it is interesting to note that the Wisconsin Supreme Court similarly held that the public's right to use submerged lands up to the high water mark is only applicable when the waters actually extend to such mark. *Doemel v Jantz*, 180 Wis 225, 236; 193 NW 393 (1923).

*Bay Harbor Co v Monroe City Council*, Walker Chancery Rep 155 (1843), the issue of public ownership of the Great Lakes was addressed for the first time by a Michigan court. In *La Plaisance*, the Court of Chancery addressed the state's right to improve navigation in Lake Erie. The Legislature had authorized the city of Monroe to build a canal connecting the River Raisin to the lake. The harbor company brought suit to enjoin the project, claiming that the canal would divert so much water from the river that its downriver warehouses would be rendered inaccessible by boat. However, the court held that the harbor company did not have a right to the flow of water in the river in its natural bed because "[t]he public owns the bed of this class of rivers, and is not limited in its right to an easement, or right of way only." *Id.* at 168. The court also noted that "with regard to our large lakes, or such parts of them as lie within the limits of the state[,] [t]he proprietor of the adjacent shore has no property whatever in the *land covered by the water of the lake*." *Id.* (emphasis added). Moreover, it should be noted that before *La Plaisance*, and before statehood, Michigan was part of the Northwest Territory, which was ceded to the United States by Virginia in 1784. Under Virginia law, a

15

littoral owner held title to soil in tidewaters to the low water mark. *Shively*, *supra* at 24-25.

The understanding that the public's interest under the public trust doctrine is limited to the submerged lands of the Great Lakes was also expressed by Justice Champlin in his concurring opinion in *Lincoln v Davis*, 53 Mich 375; 19 NW 103 (1884). In *Lincoln*, a fisherman had placed stakes in Thunder Bay, off an island, in order to set some fishing nets. The island's owner removed the stakes, claiming that he had the exclusive right to fish in the waters off his island. The *Lincoln* majority, while not discussing the boundary between littoral property and public trust property, held that the owner had no right to interfere with the fisherman's stakes. Justice Champlin noted that "when [Michigan] was admitted into the Union this political jurisdiction devolved upon the State, and the title to the *soil under the navigable waters* of the Great Lakes became vested in the State as sovereign to the same extent and for the same reasons that the title of the bed of the sea was vested in the king." *Id.* at 384 (emphasis added). However, the state's title only extends to the "*low-water mark.*" *Id.* at 384-385 (emphasis added). In fact, according to Justice Champlin, "The paramount rights of the public to be preserved are those of navigation and fishing,

and this is best accomplished by limiting the grants of lands bordering on the Great Lakes to [the] low-water mark." *Id.* at 385-386.

The United States Supreme Court defined the scope of the public trust doctrine as applied to the submerged lands of the Great Lakes in *Illinois Central I, supra* at 437. In *Illinois Central I,* the Illinois legislature had granted the railroad title to one thousand acres of submerged land on Lake Michigan. Four years later, the Illinois legislature repealed this act and sought to quiet title to submerged lands. The Supreme Court held that "the State holds the title to the *lands under the navigable waters of Lake Michigan . . .* and that title necessarily carries with it control over the waters above them whenever the lands are subjected to use." *Id.* at 452 (emphasis added). Because the state's public-trust title is a function of its sovereignty, the lands covered by the doctrine cannot be alienated, except when such alienation promotes the public use of them and the public use of the lands and waters remaining is not harmed. *Id.* at 452-453.

Just four years later, in *People v Silberwood*, 110 Mich 103, 107; 67 NW 1087 (1896), this Court seized upon the *Illinois Central I* explanation of the public trust doctrine to support its holding that the boundary between

public trust lands and littoral lands is the low water mark. In *Silberwood,* the defendant was convicted of cutting submarine vegetation on Lake Erie. The defendant claimed that the owners of land lying adjacent to Lake Erie, including his employer who ordered removal of the vegetation, owned the land to the center of that Great Lake, subject to the rights of navigation. The Court, quoting *La Plaisance*, held that a littoral owner does not have any title in land covered by the Great Lakes. *Id.* at 106. The Court then noted that the *Illinois Central I* decision

> is in harmony with the doctrine laid down in the early case of *La Plaisance Bay Harbor Co.* v. *Council of City of Monroe*, which I do not think has ever been overruled in this State so far as it affects the rights of shore owners on the borders of the Great Lakes. This doctrine, too, is in harmony with the decisions in all of the States bordering on these great seas. [*Id.* at 108-109.]

Further, the Court noted that decisions of other Great Lakes states were in line with both *La Plaisance* and *Illinois Central I*:

> The decisions in New York (*Champlain, etc., R. Co.* v. *Valentine*, 19 Barb. 484 [NY Sup (1853)]), in Pennsylvania (*Fulmer* v. *Williams*, 122 Pa. St. 191 [15 A 726 (1888)]), and in Ohio (*Sloan* v. *Biemiller*, 34 Ohio St. 492 [1878]), all hold that the fee of the [littoral] owner ceases at the low-water mark. [*Id.* at 107.]

18

This Court reaffirmed the principle that the public trust doctrine applies only to submerged lands in *People v Warner*, 116 Mich 228; 74 NW 705 (1898). At issue in *Warner* was ownership of a marshy island that was previously submerged under Saginaw Bay. The defendant claimed ownership of the marshy island as an accretion to his adjacent island. In placing the boundary at the water's edge, the Court stated:

> The depth of water upon *submerged land* is not important in determining the ownership. If the absence of tides upon the Lakes, or their trifling effect if they can be said to exist, practically makes high and low water mark identical for the purpose of determining boundaries (a point we do not pass upon), the limit of private ownership is thereby marked. The adjoining proprietor's fee stops there, and there that of the State begins, whether the water be deep or shallow, and although it be grown up to aquatic plants, and although it be unfit for navigation. The right of navigation is not the only interest that the public, as contradistinguished from the State, has in these waters. It has also the right to pursue and take fish and wild fowl, which abound in such places; and the act cited has attempted to extend this right over the lands belonging to the State adjoining that portion of the water known to be adapted to their sustenance and increase. [*Id.* at 239 (emphasis added).][16]

---

[16] The majority claims that when read "in context," *Warner* does not recognize "a single boundary between the riparian owner's title and state control . . . ." *Ante* at 22 n 16. Specifically, the "context" relied upon by the majority is *Warner's* distinction between the state's and the public's interests in submerged lands. However, there is no context under which *Warner* can reasonably be read to

The Court found that a connection between the marshy island and the defendant's island, which existed during times of low water, raised an issue of material fact. If the connection was evidence that land washed up against the defendant's island and that eventually caused the marshy island to rise from the water, then the defendant held title to such land by accretion. However, if the island arose from the water first and only then began to extend towards the defendant's island, then title belonged to the state. In any case, the Court held that summary disposition was inappropriate and remanded the case for a new trial.

---

support the majority's new rule of law. The passage cited by the majority comes directly after this Court's holding that the state holds title to all submerged lands, regardless of navigability. In justifying the state's title to lands "unfit for navigation," *Warner* notes that the public has interests in those submerged lands above and beyond a navigational interest, i.e., "the right to pursue and take fish and wild fowl . . . ." Further, in an opinion replete with novel concepts of law, perhaps the most creative statement by the majority is that somehow the phrase "[t]he adjoining proprietor's fee *stops there* [i.e., where the water is], and *there* that of the State *begins*" does not represent a single boundary. If the state's title *begins* at the point where the adjoining proprietor's title *ends*, there can only be one boundary and, therefore, there cannot be an overlapping of titles as suggested by the majority. Accordingly, and despite the majority's claims to the contrary, this Court has explicitly "enshrined" a solitary boundary between littoral lands and public trust lands for at least 107 years.

One of the most thorough opinions addressing the public trust doctrine was Justice Hooker's concurring opinion in *State v Lake St Clair Fishing & Shooting Club*, 127 Mich 580; 87 NW 117 (1901).[17] Justice Hooker began his analysis by noting that the "title that Michigan took when it was admitted to the Union in 1836 is not limited to water sufficiently deep to float craft, but extends to the point where it joins the ground of the [littoral] owner, 'whether the water be deep or shallow, and although it be grown up to aquatic plants and unfit for navigation.'" *Id.* at 586, quoting *Warner, supra* at 239. Likewise, the title of the abutting littoral owner extends to the shoreline. *Fishing & Shooting Club, supra* at 587. Thus, "when the water in the lakes stands at *low-water mark, . . .* the title [is] in the State, and all land between low-water mark and the meander line belongs to the abutting proprietor . . . ." *Id.* at 590 (emphasis added).

The common-law limitation of the scope of the public trust doctrine was reaffirmed by this Court in *Hilt*. In overruling the short-lived *Kavanaugh* cases, we held that "the purchaser from the government of public land on the

———————————

[17] Justice Hooker's analysis of the public trust doctrine was subsequently cited with approval by the unanimous opinion of this Court in *State v Venice of America Land Co*, 160 Mich 680, 702; 125 NW 770 (1910).

21

Great Lakes took title to the water's edge." *Hilt, supra* at 206. We also noted that the waters of our Great Lakes commonly change the landscape surrounding them, by erosion or deposits made by the water, in a gradual and imperceptible manner. *Id.* at 219. In order to account for this constant change, the title of a littoral owner "follows the shore line under what has been graphically called 'a movable freehold.'" *Id.* (citation omitted). The title to land above the water's edge is "'independent of the law governing the title in the soil covered by the water.'" *Id.,* quoting *Shively, supra* at 35.[18]

To summarize, under the common law as it has developed in Michigan, when the water is at a low point, the state holds title to the submerged land, including the wet sands, while title to unsubmerged land is in the littoral owner. *Warner, supra; Fishing & Shooting Club, supra.* As the water level rises, the public gains the right to use the entire surface of the lake up to the water's edge-- the point at which wet sands give way to dry sands-- for public

---

[18] *Hilt* also noted that to hold otherwise would effectively cut the littoral owner off from the water, thereby destroying the very characteristic that defines property as "littoral"-- its contact with the water. *Hilt, supra* at 219.

trust purposes.  *Hilt, supra*; *Warner, supra.*  Likewise, the littoral owner's title follows the rise and fall of the waters.[19]  *Id.*  Accordingly, the boundary of the littoral owner's title is the most landward of either the "low water mark" or the current location of the water itself.[20]  The

---

[19] The majority misstates my position as "granting littoral landowners all property down to where unsubmerged land ends, which [I] locate[] at the water's edge, regardless of the terms of landowners' deeds."  *Ante* at 38-39.  There is no basis for this statement.  The characteristic that defines property as "littoral" is its contact with the water.  *Hilt, supra* at 219.  In other words, a property owner whose deed does not extend to the water's edge is not a littoral owner and, therefore, would have no more rights in unsubmerged property than any other member of the public.  Obviously, a property owner is only a littoral owner if the deed gives title to the water's edge, however the "water's edge" may be described.  For example, in the instant case, defendants' deed states that the "meander line of Lake Huron" forms part of the boundary of their property.  As we held in *Farabaugh v Rhode*, 305 Mich 234, 242; 9 NW2d 562 (1943), "the meander line of Lake Michigan is a line of description and not one of boundary and that one owning to such meander line owns to the water's edge subject to accretion and reliction unless a contrary intention is expressed in the conveyance."  There is no evidence of a contrary intention in this case and, therefore, defendants hold title to the water's edge.

[20] The majority notes that this Court has identified "some ambiguity regarding whether the high or low water mark serves as the boundary of the public trust."  *Ante* at 22, citing *People, ex rel Director of Conservation v Broedell*, 365 Mich 201, 205-206; 112 NW2d 517 (1961).  *Broedell* cited two cases with "language seemingly favorable to the high-water-mark theory."  *Id.* at 206.  One of those cases, *Collins v Gerhardt*, 237 Mich 38; 211 NW 115 (1926), defined the public trust doctrine as it applies to *rivers*.  The other case, *Venice of America Land Co, supra* at 702, discussed the location of a certain island at the time of

23

state's public trust title, then, "begins [where the water is], whether the water be deep or shallow . . . ." *Warner, supra* at 239.[21]

In rejecting this understanding, the majority's opinion virtually ignores 162 years of case law, and instead simply announces that "Michigan's courts have adopted the ordinary high water mark as the landward boundary of the public trust" doctrine. *Ante* at 21. Thus, according to the majority, unsubmerged land up to the "high water mark" remains subject to the trust. To support its assertion, the majority cites with approval this Court's holding in *Peterman v Dep't of Natural Resources*, 446 Mich 177, 198-199; 521 NW2d 499 (1994). In doing so, the

statehood. If the island was completely submerged at statehood and only afterwards arose out of Lake St. Clair, then the island belonged to the state. See, e.g., *Warner, supra*. The Court noted that, during periods of high water, the island at issue was completely submerged. According to the Court, Lake St. Clair experienced one such period of high water in 1837-1838. Therefore, because the island was submerged land at the time of statehood and only arose out of the water afterwards, title to such property was in the state. *Id.* Further, *Venice of America Land Co* expressly adopted Justice Hooker's concurring opinion from *Fishing & Shooting Club*. As argued earlier, Justice Hooker found that the boundary between a littoral owner's property and property held by the state in trust is the low water mark, at least at times of low water.

[21] The majority has interpreted the "water's edge" principle as creating a "universal line along the Great Lakes . . . ." *Ante* at 41. However, the water's edge is not a "universal line," but rather a dynamic boundary that moves as the waters of the Great Lakes move.

majority fails to acknowledge that *Peterman* did not address the public's right to use property under the public trust doctrine at all,[22] but rather addressed the *state's* right to improve navigation under the navigational servitude.[23] We began our analysis in *Peterman* by affirming that the "'title of the [littoral] owner follows the shore line under what has been graphically called "a moveable freehold."'" *Id.* at 192, quoting *Hilt, supra* at 219. However, we also found that such title is not absolute. Rather, the state retains a navigational servitude on unsubmerged property landward of the water's edge that may again become submerged during periods of high water.[24] In order to accommodate both the rights of the littoral owner

---

[22] Even if *Peterman* did apply in the public trust context-- which it does not-- an examination of its holding indicates a definition of the public trust doctrine far more in line with "low water mark" cases such as *Alger* than with the "high water mark" cases cited by the majority.

[23] The majority argues that this decision "relied not simply on a 'navigational servitude' unique to that case but rooted that 'navigational servitude' in the public trust doctrine." *Ante* at 21 n 15. However, *Peterman* specifically states that "plaintiffs' [littoral] rights are subject to the navigational servitude retained by the State of Michigan." *Peterman, supra* at 193-194. *Peterman* does not state that littoral rights are subordinate to the right to fish and hunt or the right to walk. Rather, the Court limited its holding to the *state's* right to improve navigation.

[24] The federal government also retains a navigational servitude on the Great Lakes and the lands beneath them.

and the potential use of unsubmerged land for navigation, we determined that the littoral owner's title is "a limited title . . . that is subject to the power of the state to improve *navigation.*"  *Peterman, supra* at 195 (emphasis added).  That is, the state has the right to *regulate* this unsubmerged land to ensure that the littoral owner does not interfere with the public's future right to use the land for navigational purposes when it again becomes covered by the waters of the Great Lakes.  Also, the state has the right to take this unsubmerged land or otherwise take action inconsistent with the owner's littoral rights without giving due compensation to the littoral owner when it is necessary to make navigational improvements or when the taking possesses an "essential nexus" to navigation.  *Id.* at 201.  However, just as in *Alger,* the public may only *use* the land in question for navigational purposes[25] *when the land is covered by the waters of the Great Lakes.*

---

[25] We have recognized fishing as an incident of the navigational servitude in inland rivers and lakes. *Collins, supra* at 48-49.  In *Collins*, we noted that the right to fish was limited to the stream itself and that "in exercising this right people cannot go upon the uplands of riparian owners in order to gain access to the water.  If they do that they are guilty of trespass." *Id.* at 49.  See also *Bott, supra* at 64-65, in which the servitude was further limited.

Because the majority misapprehends the nature of this limited title, it has misconstrued the importance of the "ordinary high water mark" as it is described in *Peterman.* While recognizing the state's right to improve navigation, we also sought to limit the property that could be adversely affected by such improvements. To determine the scope of this limitation, we examined former MCL 281.952, which was part of the Inland Lakes and Streams Act, as well as cases defining the scope of the public trust doctrine on rivers, including *Grand Rapids Booming Co v Jarvis*, 30 Mich 308, 318-321 (1874) (holding that the public right of navigation was confined to the stream itself and that its boundary was the line of ordinary high water), and *Hall v Alford*, 114 Mich 165, 167-168; 72 NW 137 (1897) (noting that land alongside a river above the high water line could not be taken without just compensation and due process). On the basis of our review of these authorities, we determined that "'the limit of the public's right is the ordinary high water mark of the river.[26] This means that

---

[26] We adopted the definition of "ordinary high water mark" from the Inland Lakes and Streams Act, former MCL 281.952(h). *Peterman, supra* at 198 n 29. That statute defined the mark as,

the ownership of fast land[27] is unqualified and not burdened with [the state's right to improve navigation].'" *Peterman, supra* at 198 (citation omitted). Applying this rule of rivers to the Great Lakes, we held that destruction of the littoral owner's property above the "ordinary high water mark" was "an unconstitutional taking of property without due process and just compensation."[28] *Id.* at 200.

---

the line between upland and bottomland which persists through successive changes in water levels, below which the presence and action of the water is so common or recurrent that the character of the land is marked distinctly from the upland and is apparent in the soil itself, the configuration of the surface of the soil, and the vegetation.

[27] "Fast land" is "property that is 'above the high-water mark of' the stream, river, or other body of water that abuts the property." *Peterman, supra* at 181 n 4, quoting 26 Am Jur 2d, Eminent Domain, § 192, p 873.

[28] The plaintiffs' recovery in *Peterman* was not limited to compensation for the damage done to the fast lands. We also concluded:

While generally the navigational trust permits the state to improve waterways without compensating for nonfast lands, the trust does not grant blanket authority to destroy private property-- the loss of the property must be necessary or possess an essential nexus to the navigational improvement in question. In the instant case, no essential nexus existed between the construction of the boat launch and the utter destruction of plaintiffs' beach. The taking of the property served no public interest because the ramp could have been built without destroying plaintiffs' property. Thus, we affirm the trial

Thus, contrary to the claims of the majority, *Peterman* did not alter the rule of *Warner* and *Hilt* that the public's right to use property under the public trust doctrine is limited to submerged lands. Rather, the "ordinary high water mark" is simply the outside edge of property that may either be regulated to preserve future navigational interests at times of high water or taken without compensation for navigational improvements. *Id.* at 202. The majority fails to recognize that this Court's holding applied only to the "public's rights" under the *navigational servitude*. As a result, the majority unwarrantedly expands the scope of our holding in *Peterman* to create new rights under the public trust doctrine, rights that were never contemplated in that case.

II. MISDEFINITION OF LANDS WITHIN THE PUBLIC TRUST DOCTRINE.

Even if the majority were correct in its understanding of the "ordinary high water mark," which for the reasons set forth I do not believe it to be, its definition of lands encompassed by the public trust doctrine is inconsistent with both the common-law scope of the public trust doctrine and the realities of the Great Lakes. The

court's award of damages for the loss of plaintiffs' property [i.e., the property below the "ordinary high water mark"]. [*Id.* at 201-202.]

majority does not apply Michigan law, but instead, without analysis or explanation, summarily adopts Wisconsin's definition of the "ordinary high water mark," which it derives from a case involving a Wisconsin *river*. Further, while the majority admits that the "ordinary high water mark" is a term used to define the scope of the public trust doctrine in tidal waters, it fails to account for the fact that the Great Lakes have no true scientific low and high water marks as exist on the seashore. Even given the majority's attempt to graft this tidal-based term upon the nontidal Great Lakes, its definition bears little resemblance to the common-law standard. In creating a new definition of "ordinary high water mark" based on the portions of the common law of Wisconsin it finds amenable, the majority fails to provide either lakefront property owners or the public with the slightest guidance in understanding the lands in which the new rights granted to the public may be exercised.

The majority defines the "ordinary high water mark" as "'the point on the bank or shore up to which the presence and action of the water is so continuous as to leave a distinct mark either by erosion, destruction of terrestrial

30

vegetation, or other easily recognized characteristic.'"[29]

*Ante* at 27, quoting *Diana Shooting Club v Husting*, 156 Wis 261, 272; 145 NW 816 (1914). This definition is derived from a State of Wisconsin case involving that state's public trust doctrine as it applies to an *inland river*. Why this court now finds it necessary to abandon Michigan common law and replace it with Wisconsin's common law, or at least those portions the majority finds persuasive, is not explained. As the United States Supreme Court noted in *Shively, supra* at 26, the determination of what lands fall within the scope of the public trust doctrine is different in each state. After reviewing the laws of several states, that Court remarked

> that each State has dealt with the lands under the tide waters within its borders according to its own views of justice and policy, reserving its own control over such lands, or granting

---

[29] The majority concludes that the boundary of the public trust doctrine is the "ordinary high water mark" because the "lake has not permanently receded from that point and may yet again assert its influence up to that point." *Ante* at 27. Does the majority mean that the public has access to a littoral owner's property that, although currently dry, has been wet at some point in the past and *may* again be wet some day in the future? If so, what is the relevant time frame to determine if the water has permanently receded or not? Is it a day? Or a month? Or a year? Or a decade? Or since statehood? Or since the retreat of the glaciers 14,000 years ago? The majority does not say. Further, how is a member of the public or a property owner to ascertain whether lands in question "may yet again" become submerged? Again, the majority does not say.

31

rights therein to individuals or corporations, whether owners of the adjoining upland or not, as it considered for the best interests of the public. *Great caution, therefore, is necessary in applying precedents in one State to cases arising in another.* [*Id.* (emphasis added).]

The majority has failed to pay heed to the United States Supreme Court's advice in this matter. The majority has also failed to examine the Wisconsin public trust doctrine in order to determine whether the policy reasons underlying the majority's adoption of the Wisconsin understanding of the "ordinary high water mark" is even compatible with *Michigan's* "views of justice and policy . . . ." *Id.* Rather than conduct such a review, the majority concludes that this definition is apt because it "has served another Great Lakes state for some hundred years and is in accord with the term's limited development in our own state." *Ante* at 29-30.[30]

However, even a cursory review of the Wisconsin cases cited by the majority suggests a rule more in line with the decision of our Court of Appeals-- a decision unanimously rejected by this Court-- than the rule favored by the majority. In *Diana Shooting Club*, a hunter had floated his

---

[30] While the *Diana Shooting Club* definition has been used by Wisconsin for nearly one hundred years, the initial express definition of the water's edge principle in *Warner* predates the *Diana Shooting Club* rule by sixteen years.

32

boat into an area overgrown by vegetation for the purpose of shooting wild ducks. The riparian owner claimed that, pursuant to its ownership of the soil beneath the river, the members of its organization had the exclusive right to hunt in those waters. The Wisconsin Supreme Court recognized the riparian owner's title in the soil beneath the river, but also found that the waters themselves "should be free to all for commerce, for travel, for recreation, and also for hunting and fishing, which are now mainly certain forms of recreation." *Diana Shooting Club, supra* at 271. It ultimately held that:

> Hunting on navigable waters is lawful *when it is confined strictly to such waters* while they are in a navigable stage, and between the boundaries of ordinary high water marks. When so confined it is immaterial what the character of the stream or water is. It may be deep or shallow, clear or covered with aquatic vegetation. By ordinary highwater mark is meant the point on the bank or shore up to which the presence and action of the water is so continuous as to leave a distinct mark either by erosion, destruction of terrestrial vegetation, or other easily recognized characteristic. [*Id.* at 272 (emphasis added).]

Thus, unlike the majority, *Diana Shooting Club* restricted public trust activity to the *waters themselves*. Indeed, the Wisconsin Supreme Court confirmed this interpretation in *Doemel v Jantz*, 180 Wis 225, 236; 193 NW 393 (1923), noting that:

33

What was said in the *Diana Shooting Club Case* on the subject of the rights of a hunter to pursue his game up to the ordinary high-water mark, merely affirmed the public right to pursue the sport of hunting to the ordinary high-water mark of a navigable river while the waters of the river actually extended to such mark.[31]

The Wisconsin Supreme Court later suggested that the *Diana Shooting Club's* definition of the ordinary high water mark also applied to the Great Lakes. *State v Trudeau*, 139 Wis 2d 91; 408 NW2d 337 (1987).[32] In *Trudeau*, a littoral owner along Lake Superior sought to build condominiums within an area below the "ordinary high water mark" of Lake Superior. The littoral owner argued that the area in question was not navigable and, therefore, he was entitled to use the lake bed. The Wisconsin Supreme Court disagreed, reasoning that the state's interest extended to

---

[31] *Doemel* addressed the public trust doctrine as it applied to inland lakes. Interestingly, while the majority claims that a case applying the public trust to rivers is perfectly legitimate to apply in the littoral context, it concludes that *Doemel* is inapplicable, presumably because it applies to an inland lake.

[32] The majority observes that its new definition was also invoked in a footnote by the Wisconsin Supreme Court in *R W Docks & Slips v State*, 244 Wis 2d 497, 510 n 2; 628 NW2d 781 (2001) (citing *Trudeau, supra*, for the definition). *Ante* at 28. However, the *R W Docks* case involved a claimed regulatory taking, based on Wisconsin's refusal to issue a dredging permit. The location of the ordinary high water mark was not at issue and the case did not involve a question of public access to land within the public trust. Thus, the majority apparently is basing its new rule on mere *dictum* from the decision of another state's Supreme Court.

the "ordinary high water mark" of Lake Superior. *Id.* at 103. In discussing the "ordinary high water mark," the court cited with approval the definition from *Diana Shooting Club*. However, the court's ultimate disposition in that case was to remand "for findings concerning those portions of the site higher than 602 feet [above sea level, according to the International Great Lakes Datum], the [ordinary high water mark] of Lake Superior." *Id.* at 110. Thus, *Trudeau* held that the "ordinary high water mark" is defined by the International Great Lakes Datum ("IGLD") level-- the very standard that has been unanimously rejected by the justices of this Court.[33]

To summarize, none of the few Wisconsin cases cited by the majority addresses the issue of whether the public has

---

[33] The majority, apparently recognizing the vagueness of its definition of the "ordinary high water mark," observes, "the precise location of the ordinary high water mark at any given site on the shores of our Great Lakes remains a question of fact." *Ante* at 30. While the majority again cites *Trudeau* as an example of how such a "question of fact" can be answered, *ante* at 28 n 20, it neglects to note that *Trudeau* adopted the International Great Lakes Datum (IGLD) definition of ordinary high water mark. *Trudeau, supra* at 110. However, the majority has held that the Great Lakes Submerged Lands Act (GLSLA), which also uses that datum, is *not* dispositive in defining the landward boundary of the public trust. *Ante* at 14-19. Does the majority mean to suggest that, despite this Court's holding that the GLSLA is not dispositive, the ILGD is still relevant in determining the location of the ordinary high water mark for public trust purposes in this state? The majority does not say.

a right to use currently unsubmerged land below the "ordinary high water mark" for public trust purposes. Indeed, the Wisconsin public trust doctrine specifically limits the public's use of submerged lands to when those lands are covered by the waters themselves. In addition, to the extent that the majority believes that *Trudeau* makes the *Diana Shooting Club* definition applicable to the Great Lakes, the majority fails to note that *Trudeau* adopted the IGLD definition of the "ordinary high water mark" on the Great Lakes. *Trudeau, supra* at 110. In determining the location of the "ordinary high water mark," *Trudeau* specifically relied on the following evidence:

> The DNR's area water management specialist, Richard Knitter, testified that he determined the lake's OHWM [ordinary high water mark] approximately one-half mile from the site at a protected location with a clear erosion line that was free from excessive wave action. Knitter then determined that this site's elevation was 602 feet I.G.L.D. He transferred the elevation of the OHWM site to a number of points at the project site and concluded that approximately half of the site was below Lake Superior's OHWM. The developers' surveyor did not determine the OHWM of the site or Lake Superior. [*Id.* at 106-107.]

The court concluded that "[a]ny part of the site at or below 602 feet I.G.L.D. is within the OHWM of Lake Superior and is therefore protected lake-bed upon which building is prohibited." *Id.* at 109. The presence of this single,

36

clear definition stands in stark contrast to the vague and ever-changing, "fact-specific," "ordinary high water mark" newly promulgated by the majority. In contrast to the Wisconsin Supreme Court, this Court expends its energies explaining why our Great Lakes Submerged Lands Act (GLSLA), MCL 324.32501 *et seq.*, which relies upon the IGLD, is *not* dispositive in defining the landward boundary of the public trust. *Ante* at 14-19.

In stating that "we are persuaded to adopt [the *Diana Shooting Club* definition of "ordinary high water mark"] to clarify a term long used but little defined in our jurisprudence," *ante* at 28, the majority adopts the law of another state, without much explanation as to why that law has been chosen from among the laws of the fifty states or, even more significantly, why the law of *any* other state is seen as necessary to replace the long-settled law of Michigan. Further, the majority adopts only a part of the law of that other state, again without much explanation as to why it has chosen to adopt only parts of that other state's law. Finally, to compound this inexplicable process, the majority fails to accord significant consideration to the manner in which the courts of the other state have interpreted its own law, misconstruing in

37

the process even the few decisions to which it gives consideration.

Even absent the differences between Wisconsin and Michigan law, the *Diana Shooting Club* standard was derived from the very different context of *riparian* property.[34] Undeterred, the majority simply utilizes this standard without explanation of how it should be modified for application on the Great Lakes. The result is a definition that is doubly vague, because the majority not only fails to explain what kind of "distinct mark" is considered to be so "easily recognizable" that it can be allowed to determine the limits of the public trust, but it also fails to provide any time frame for determining how "continuous" the "presence and action of the water" must be in order to leave such a mark. The majority fails to define either of these terms in a manner that will enable the public or

---

[34] The majority observes that the *Diana Shooting Club* definition is not "far removed from meanings previously recognized in Michigan." *Ante* at 29. In support, the majority cites MCL 324.30101(i), a part of the current version of the former Inland Lakes and Streams Act. However, the majority fails to acknowledge that this statute *expressly states* that it does not apply to the Great Lakes. MCL 324.30101(f). I also assume that the majority in characterizing its definition as "not far removed" from another definition-- that which, in fact, has *been* the law of Michigan-- is acknowledging, albeit euphemistically, that it is adopting a new rule. The majority alternates between the adoption of new rules and disclaiming that it has adopted such new rules.

property owners to determine which lands are within the public trust. What kind of "distinct mark" is sufficiently "recognizable" to bring unsubmerged land within the scope of the public trust? Since it cannot be that point at which wet sands give way to dry sands-- the majority having rejected the position of this dissent-- is this "distinct mark" a function of where the waves have deposited seashells? Is it a function of where debris has been washed ashore? Is it a function of where some line of vegetation can be identified? Or is it a function of where sand castles are no longer standing? The majority does not say. Moreover, even if the public or the property owner could discern the relevant "distinct mark," how would such persons determine how "continuous" the "presence and action of the water" has been-- or indeed must be-- in leaving such a mark. It cannot be limited to the "current ebb and flow of the waves," as that too is the position of this dissent which the majority rejects. How continuous then is "continuous?" Is it a month, a season, a year, a century, or an epoch? Again, the majority does not say.

Moreover, the majority would apparently expand public access to private littoral lands even *beyond* its new definition of the "ordinary high water mark." The majority states, "'where the bank or shore at any particular place

is of such a character that it is impossible or *difficult* to ascertain where the point of ordinary high-water mark is, recourse may be had to other places on the bank or shore of the same stream or lake to determine whether a given stage of water is above or below ordinary high-water mark.'" *Ante* at 27-28, quoting *Diana Shooting Club, supra* at 272 (emphasis added).  Does the majority intend by this to say that the public may now cross onto private littoral property in order to determine *where* the new "ordinary high water mark" lies?  If so, the public would seem to have access to such property even beyond the "ordinary high water mark."  The only apparent limitation on the public's right of access is that the "ordinary high water mark" must be "difficult" to ascertain.  Given that under the majority's new definition the "ordinary high water mark" will never be anything *other* than difficult to ascertain-- and, as the majority admits, will generally constitute a "question of fact" *ante* at 30-- there appears to be considerable potential for access by the public upon private littoral lands even beyond the "ordinary high water mark."  Still, the majority is indisposed to answer any of the questions that are most dispositive in determining where private and public rights begin and end.  In eventual course, these questions, so indispensable to the

determination of individual property rights, will have to be addressed by the Department of Natural Resources (DNR) with virtually no guidance from this Court.

In leaving such questions to the DNR, the majority adopts the premises of administrative law in the very different realm of property law, by defining critical questions of property rights not in well-understood terms that conduce toward specific boundaries, but in language drawn from the modern administrative process in which vague and empty terms are given meaning by regulatory agencies, such as the DNR, with subsequent deferential review by the courts. This is a prescription for uncertainty, and uncertainty is a prescription for litigation, and the majority with its eyes wide open has chosen to give Michigan both.

Further, the majority's inclusion of unsubmerged lands within the public trust because "the lake has not permanently receded from that point and may yet again exert its influence up to that point," *ante* at 27, conflicts with the traditional common-law definition of the public trust doctrine. At common law, the high water mark was defined as "'the line of the medium high tide between the springs

41

and the neaps.[35]  All land below that line is more often than not covered at high water, and so may justly be said, in the language of Lord Hale, to be covered by the ordinary flux of the sea.'"  *Borax Consolidated, supra* at 25, quoting *Attorney-General v Chambers*, 4 De G M & G 206, 217; 43 Eng Rep 486 (1854).[36]  High tides move with the moon as it revolves around the Earth.  At most ocean shores

---

[35]  The "spring tide" is defined as "the large rise and fall of the tide at or soon after the new or full moon." The "neap" tide is defined as "those tides, midway between spring tides, that attain the least height."  *Random House Webster's College Dictionary* (1997).

[36]  The majority asserts that I offer this as an "authoritative definition for ordinary high water mark" and that somehow there is a tension between this definition and my criticism of the majority's creation of new law in this case.  *Ante* at 41 n 33.  That the majority does not recognize the English common-law definition of the ordinary high water mark is not surprising given that its novel definitions of the term bear no resemblance.  According to the majority:

> [The] ebb and flow, thus reaching one point on the shore at low tide and reaching a more landward point at high tide.  The latter constitutes the high water mark on a tidal shore. The land between *this mark* and the low water mark is submerged on a regular basis, and so remains subject to the public trust doctrine as "submerged land."  [*Ante* at 20-21 (emphasis added).]

Thus, it appears that the majority takes the position that the public trust extends to the highest high tide. However, as noted in *Borax Consolidated,* the ordinary high water mark is *not* the highest high tide, but rather the medium high tide between the spring and neaps, which is rarely exposed to the open air for more than twenty-four hours.

throughout the world, two high tides and two low tides occur every lunar day.[37]  A typical seaport will alternate between high and low tides about every six hours.  Thus, while the ocean bed may be temporarily exposed to the open air during low tide, such land will again be submerged during the next high tide.  Because the land is continually being affected by the action of the water, it falls within the scope of the English common-law doctrine, even when exposed to open air.

In contrast, tidal forces acting on the Great Lakes are of such a "trifling effect," *Warner, supra* at 239, that they cannot even be measured without precise instruments.[38]  Thus, there is no "high" or "low" water marks, as they are scientifically understood.  Instead, lake levels are affected seasonally by the natural operation of the hydrologic cycle, which includes precipitation,

---

[37] A lunar day is the time it takes for the moon to return to a point above the Earth: approximately twenty-four hours and fifty minutes.  See definition of "day, lunar" at <http://www.ngs.noaa.gov/CORS-Proxy/cocoon/glossary/xml/D.xml> (accessed June 24, 2005).

[38] According to the National Oceanic and Atmospheric Administration, spring tide in the Great Lakes is less than 2 inches (5 cm) in height.  See <http://co-ops.nos.noaa.gov/faq2.html> (accessed June 24, 2005).

evaporation, condensation, and transpiration.[39]   During the winter, the air above the lakes is cold and dry, compared to the relatively warm temperature of the lake.   As a result, the amount of water that evaporates into the air exceeds the water vapor that condenses back into the lakes. Any precipitation that falls on the lands surrounding the lakes is in the solid form of snow, and, thus, is not returned to the lake via runoff.   As a result, more water leaves the lake than enters it in this season, resulting in a decline in lake levels.[40]   As snow begins to melt in the early spring, runoff into the lakes increases.   Further, as temperatures increase, the warm, moist air above the relatively cold lakes limits evaporation to an amount less than the rate of condensation.   As a result, average water

---

[39]   See, generally, United States Army Corps of Engineers and the Great Lakes Commission, *Living with the Lakes* (1999), pp 13-18.   This publication may be accessed at <http://www.glc.org/living/> (accessed June 24, 2005).

[40]   According to the United States Army Corps of Engineers, the lowest average lake level from 1918 to 2003 occurred as follows:   Lake Superior (March, 601.21 feet above sea level); Lakes Michigan and Huron (February, 578.48 feet above sea level); Lake St. Clair (February, 573.43 feet above sea level); and Lake Erie (February, 570.8 feet above sea level).   See <http://www.lre.usace.army.mil/greatlakes/hh/greatlakeswaterlevels/historicdata/longtermaveragemin-maxwaterlevels/> (accessed June 24, 2005).

levels rise throughout the spring and eventually peak during midsummer.[41]

These natural phenomena suggest the unworkability of placing the public trust boundary at the "ordinary high water mark" as it is defined by the majority. If the "ordinary high water mark" is defined as a static boundary, then the public trust doctrine would include unsubmerged lands that are only covered by the water on an infrequent basis. Under the English common-law definition, such lands should be treated in a manner similar to lands covered by the spring tides, i.e., they are not subject to the public trust doctrine. If the "ordinary high water mark" is defined as a floating boundary, then it becomes nearly impossible for either a beach user or a littoral property owner to determine where the boundary is located. To account for the hydrologic cycle, the "ordinary high water mark" would need to be redefined on a monthly or seasonal basis. Further, the boundary would have to be readjusted on a year-by-year basis to account for long-term changes to

---

[41] According to the United States Army Corps of Engineers, the highest average lake level from 1918 to 2003 occurred as follows: Lake Superior (September, 602.23 feet above sea level); Lakes Michigan and Huron (July, 579.43 feet above sea level); Lake St. Clair (July, 574.77 feet above sea level); Lake Erie (June, 571.95 feet above sea level). *Id.*

lake levels caused by weather fluctuations.  Since 1918, the Great Lakes have experienced three periods of extremely low water levels, in the late 1920s, mid-1930s, and mid-1960s.  Periods of extreme high water were experienced in the early 1950s, early 1970s, mid-1980s, and mid-1990s.  The "point on the bank or shore up to which the presence and action of the water is so continuous as to leave a distinct mark either by erosion, destruction of terrestrial vegetation, or other easily recognized characteristic" in 1926 would have been in a completely different location than the point reached in 1986.  Likewise, that point in February of each year would be a completely different location than the same point in July of each year.  Thus, any definition of where "the presence and action of the water is so continuous as to leave a distinct mark either by erosion, destruction of terrestrial vegetation, or other easily recognized characteristic" must vary depending on what method is used to calculate that level.[42]

---

[42] For example, on Lake Huron, the average yearly level of the lake in 2003 was 577.07 feet above sea level.  The average yearly level of the lake from 1918 to 2003 was 578.94 feet above sea level.  The monthly average for June 2003 was 577.43 feet above sea level.  The monthly average for the month of June, from 1918 to 2003, was 579.33 feet above sea level.

The majority's "ordinary high water mark" also fails to account for changes to the location of the waterline caused by events unrelated to lake levels. First, wind and barometric forces can raise water at one end of the lake, causing a dip in water level at the opposite end. If the forces raising the water on one end suddenly cease, the entire lake may move in a see-saw fashion, alternatively rising and falling on each end in a "pendulum-like" movement. This phenomenon, called "seiche," can last from minutes to hours to days. Second, ice or foreign bodies such as plants may block the normal flow of rivers and channels connected to the Great Lakes, thereby causing an increase or decrease in the water level of connected lakes. Finally, most of the Great Lakes basin is rising, as the Earth's crust slowly rebounds from the removed weight of the glaciers that covered the area around 14,000 years ago. Because the glaciers were thickest in the northern part of the basin around Lake Superior, this region is rebounding at a faster rate, nearly twenty-one inches a century, than the rest of the basin. As a result, the Great Lakes are "tipping" in a way that causes water increasingly to pool in the southern portions of the Great Lakes basin. The shoreline is receding in the northern basin and advancing in the southern basin. Thus, while the "ordinary high

water mark" makes sense in tidal waters, it does not make sense in the nontidal Great Lakes because of the irregular nature of lake level fluctuations.

Further, the majority's new definition fails to account for those times when the waters of the Great Lakes go *beyond* the "ordinary high water mark," assuming that such an event could even occur under the majority's new definition. The majority justifies its new rule, on the basis of this Court's statement in *Peterman, supra* at 198, that "'the limit of the public's right is the ordinary high water mark . . . .'" (Citation omitted.) *Ante* at 40. However, the majority also states that the public trust doctrine serves to protect "the waters of the Great Lakes and their submerged lands . . . ." *Ante* at 31. Thus, when the water's edge is beyond the "ordinary high water mark," there is a conflict between the majority's stated limit of the public right to the "ordinary high water mark" and its inclusion of submerged lands within the public trust. Is a property owner or a member of the public to understand that use of submerged lands between the "ordinary high water mark" and the water's edge is forbidden? Does this mean that a member of the swimming or walking public is trapped within the Great Lakes until the water recedes to the "ordinary high water mark?" How does a member of the

48

public or a property owner determine where the "ordinary high water mark" is in such a circumstance? Does limiting public access to a submerged "ordinary high water mark" conflict with our holding in *Warner, supra* at 239, that the public trust begins where the water is, "whether the water be deep or shallow"? Or is the majority's reliance on *Peterman* somehow silently qualified to apply only when water levels on the Great Lakes lie below the "ordinary high water mark"? The majority again does not say.

By contrast, limiting the public's right of access to the "water's edge," i.e., the point at which wet sands give way to dry sands, addresses all of the various forces at work on the lakes and is consistent with the common-law definition of the high water mark. First, the "water's edge" principle reflects the dynamic natural forces at work on the Great Lakes. As the waters of the Great Lakes move, so too does the area where wet sands give way to dry sands. The littoral property owner's title, and with it his or her littoral rights, including the right of exclusive possession, follows the movement of the water.[43] As we

---

[43] However, as noted in *Peterman, supra* at 193-198*,* the littoral owner's rights are subject to regulation by the state. See e.g., MCL 324.32503 (prohibiting filling or altering land below the statutorily defined high water mark without a permit), MCL 324.32512 (prohibiting certain acts

49

explained in *Warner*, the littoral property owner's rights end where the water is "whether the water be deep or shallow, and although it be grown up to aquatic plants, and although it be unfit for navigation." *Warner, supra* at 239. At that point, the state's public trust title begins. *Id.* As correctly observed by the DNR, the area "where the water is" includes the wet sands where the waters of the Great Lakes have marked their current and continuous presence. Because by definition such sands are infused with water, the wet sands fall within the definition of "submerged lands." As a result, the "water's edge" is the point at which wet sands give way to dry sands. The water's edge marks the boundary between submerged and unsubmerged lands.[44] This position is consistent with the position of the defendant littoral owners in the instant case. Contrary to plaintiff's expressions of concern that

of waterway maintenance without a permit), and MCL 324.32512a (prohibiting mowing or removing vegetation except as permitted by the DNR).

[44] The majority claims that I would "grant an exclusive right of possession to littoral landowners . . . down to where unsubmerged land ends, which [I] locate[] at the water's edge . . . ." *Ante* at 38. A significantly more precise statement of my position is that the littoral landowner has the right of exclusive possession to unsubmerged land, while the public has the right to use submerged land under the public trust doctrine. The water's edge, i.e., where the wet sands give way to dry sands, where submerged land meets unsubmerged land, marks the limit of each of these rights.

she would be forced to walk in the water, as a member of the public she has always had the right to walk along the wet sands abutting the Great Lakes. Because the wet sands are submerged lands, a littoral owner has never had the right to prevent a member of the public from using such lands.

While I agree with the DNR's inclusion of the wet sands as submerged lands, the DNR reaches the same erroneous conclusion as the Court of Appeals, namely that the littoral owner holds title only to the "ordinary high water mark."[45] This interpretation apparently is based on the following passage from *Hilt, supra* at 226:

> The riparian owner has the exclusive use of the bank and shore, and may erect bathing houses and structures thereon for his business or pleasure (45 C.J. p 505; 22 L.R.A. [N.S.] 345; *Town of Orange* v. *Resnick*, [94 Conn 573, 578; 109 A 864 (1920)]); although it also has been held that he cannot extend structures into the space between low and high-water mark, without consent of the State (*Thiesen* v. *Railway Co*, 75 Fla. 28 [78 South. 491; L.R.A. 1918E, 718]). And it has been held that the public has no right of passage over dry land between low and high-water mark but the exclusive use is in the riparian owner, although the title is in the State. *Doemel v Jantz*, [*supra*].

---

[45] The DNR's position is consistent with the Attorney General's opinion in 1978 noting that title to property between the high water mark and the water's edge remains in the state, but the right of exclusive use remains in the littoral owner. OAG, 1977-1978, No 5,327, p 518 (July 6, 1978).

51

However, this statement from *Hilt* does not represent a conclusion of this Court. Rather, it is cited as part of this Court's response to the notion that *Kavanaugh* "gave the State substantially absolute title . . . to the upland or to use them for any public purposes." *Id.* at 224. In rejecting this theory as a justification for maintaining *Kavanaugh*, we noted that the "title" conferred to the state in *Kavanaugh* was confined "to the same trust which applies to the bed of the lake, i.e., that the State has title in its sovereign capacity and only for the preservation of the public rights of navigation, fishing, and hunting." *Id.* Thus, "the right of the State to use the bed of the lake, except for the trust purposes, is subordinate to that of the riparian owner . . . ." *Id.* at 226, citing *Town of Orange, supra* at 578. To support this point, *Hilt* noted that "it has been held that the public has no right of passage over dry land between low and high-water mark but the exclusive use is in the riparian owner, although the title is in the State." *Hilt, supra* at 226, citing *Doemel*.

This demonstrates that *Hilt* was not adopting the rule from *Doemel*, but rather was using that case to demonstrate that *Kavanaugh* did not give unlimited title to the state and, therefore, that the title granted to the state by *Kavanaugh* was not a valid basis for maintaining the meander

52

line as a boundary.  Thus, the only basis for holding that the state holds title to unsubmerged land up to the so-called high water mark is to misunderstand the importance of *Hilt*'s reference to *Doemel*.  It is clear that when *Hilt* said that a littoral owner's title goes to the water's edge, it *meant* "water's edge."  Likewise, when *Warner* said that the state's title begins where the water is, it *meant* "where the water is."

Second, the "water's edge" principle is consistent with the common-law definition of the high water mark.[46]  At common law, the area of medium high tide would seldom be dry for more than twenty-four hours at a time.  *Lorman v Benson*, 8 Mich 18, 29 (1860).  In other words, the land at or below medium high tide was generally covered by the ocean during the daily tidal cycle.  Therefore, this tidal land was considered "waste land" that was "'not capable of ordinary cultivation or occupation.'"  *Id.* at 28-29

---

[46] Although I do not agree that the "wet sands area" as it applies to the public trust doctrine is equivalent to the "ordinary high water mark" as it applies to the navigational servitude, at least one commentator has observed that the "wet beach" is the area "between ordinary high watermark and ordinary low watermark."  Pratt*, The legal rights of the public in the foreshores of the Great Lakes,* 10 Mich Real Prop Rev 237, 237 (1983).  According to this commentator, the "high water mark" and the "water's edge" are, for all practical purposes, the same in the nontidal Great Lakes.

(citation omitted).   Similarly, in the instant case, the wet sands are being inundated with water by the current ebb and flow of the waves.   However, when lake levels fluctuate, any land that is no longer subject to the ebb and flow of the waves becomes unsubmerged land, which is suitable for "ordinary occupation" and, therefore, as with lands affected by the spring tides, is not within the scope of the public trust doctrine.

Finally, the "water's edge" principle is significantly more workable than the majority's "ordinary high water mark."   A member of the public can, by simple observation, without the use of "aerial photographs, government survey maps . . . and stereo [three-dimensional] photographs," *ante* at 28 n 20, determine where he or she is allowed to use land without seeking the littoral owner's permission.[47]

---

[47] The majority claims that the "water's edge" principle provides no greater "clarity" than its new rule and that the "water's edge" standard constitutes a "charade of clarity." *Ante* at 41-42.   The reader might wish to ponder this assertion.   On the one hand, the traditional standard for delineating between public and private lands-- the standard that I would retain-- requires merely that a person be able to distinguish between wetness and dryness, between wet sands and dry sands, between where there is water and where there is not.   Even a Supreme Court justice, I would submit, should be reasonably able to draw such distinctions.   Contrast this to the majority's test that would require a person to locate "the point on the bank or shore up to which the presence and action of the water is so continuous as to leave a distinct mark either

54

When the waters recede, land that is no longer subject to the current ebb and flow of the waves will become unsubmerged land and, therefore, will again be under the exclusive control of the littoral property owner.

In conclusion, as we noted in *Warner, supra* at 239, although in dictum, the absence of tides "practically makes high and low water mark identical for the purpose of determining boundaries [along the Great Lakes]." The "water's edge" principle recognizes this reality by defining the rights of both the littoral property owner and the public in terms of the actual location of the water. This definition is consistent with the natural forces at work on the Great Lakes; it is consistent with the common-law scope of the public trust doctrine; it is consistent with historical practice in Michigan; and it creates a public trust area that can readily be identified. The majority has presented no reason why this longstanding rule no longer represents a reasonable balance between the competing interests at issue in this case. Yet, the

---

by erosion, destruction of terrestrial vegetation, or other easily recognized characteristic." The majority does not even *attempt* to offer guidance to the public or property owners as to the meaning of this standard. Rather, the majority suggests that expert witnesses will be able to identify this mark by using "aerial photographs . . ., the government survey maps, the site's present configuration, and stereo [three-dimensional] photographs . . . ." *Ante* at 28 n 20.

majority discards this clear standard, which has operated for most of the history of our state to create harmonious relations between the public and littoral property owners, and replaces it with an unknowable standard of its own invention that requires littoral property owners and the public to guess where the "ordinary high water mark" is located.

### III. MISUNDERSTANDING OF *JUS PRIVATUM/JUS PUBLICUM*

The majority's determination to apply what it has defined as the "ordinary high water mark," despite a lack of foundation in Michigan law, appears to be rooted in its fundamental misunderstanding of the distinction between the *jus privatum* and *jus publicum*. The majority notes, correctly, that the title to the submerged lands of navigable waters is bifurcated; with the *jus publicum* safeguarding the rights to the public and the *jus privatum* safeguarding private property rights, subject always to the *jus publicum*. *Nedtweg v Wallace,* 237 Mich 14, 20; 208 NW2d 51 (1927). However, rather than limit application of the doctrine to *submerged* lands, the majority instead holds that *any* conveyance of lakefront property consists solely of the *jus privatum*, with the state's *jus publicum* title including unsubmerged lands up to the "ordinary high water mark." I disagree, and instead believe that the *jus*

*publicum* applies only to the submerged lands of the Great Lakes.

The distinction between *jus privatum* and *jus publicum* was first addressed by this Court in *Lorman, supra*. In *Lorman*, a former lessee of property abutting the Detroit River claimed that he had a right to use and maintain a boom constructed in the water.[48] Under the English common law, private title to the bed of a navigable river was determined by whether the river was subject to the ebb and flow of the tides. *Lorman, supra* at 26-27. However, regardless of who held the *jus privatum*, the private owner's rights were limited to those uses that would not interfere with "the public easement of navigation[.]" *Id.* at 27. In tidal rivers, the *jus privatum* was subject to the public's "right of navigation over the whole bed of the stream at high tide, and over the water, so far as it was practicable, at all tides." *Id.* at 27-28. However, the public's rights too were not without limit. First, the public's rights did not extend to land "not commonly submerged by the average ordinary high tides, which would seldom leave any of the shore dry more than twenty-four

---

[48] A "boom" is defined as "a chain, cable, etc., serving to obstruct navigation." *Random House Webster's College Dictionary* (1997).

57

hours at a time." *Id.* at 29. Second, the public's use of the *jus publicum* was limited to "water rights," i.e., the right of navigation and fishing. *Id*. at 30. No matter who held title to the river bed, the public's right to use the river was always limited to the water itself. Because the former lessee sought to use the Detroit River for purposes other than navigation or fishing, the Court determined that the former lessee's use was not superior to that of the riparian owner and, therefore, the riparian owner could bring an action for trespass.

The limitation of the *jus publicum* to use of the water itself was also expressed by this Court in *McMorran Milling Co v C H Little Co*, 201 Mich 301; 167 NW 990 (1918).[49] In *McMorran Milling*, a dredger entered into a contract with the riparian owner for the right to remove sand from the

---

[49] The majority cites Justice Campbell's *dissenting* opinion in *Sterling v Jackson*, 69 Mich 488, 506-507; 37 NW 845 (1888), in support of its *jus privatum/jus publicum* analysis. *Ante* at 11. The *Sterling* majority observed that title to the river bed belongs to the riparian owner, but that such title is limited by the public's right of navigation. *Sterling, supra* at 500. However, the public's rights in that case were limited to "using the waters of the bay for the purpose of a public highway in the navigation of [the defendant's] boat over it . . . ." *Id.* at 501. Aside from the right of navigation, all other uses of the river bed belonged exclusively to the riparian owner. *Id*. In other words, the riparian owner's *jus privatum* was limited only by the uses *expressly* allowed under the *jus publicum,* i.e., the right of navigation. *Id.*

river bed.  The federal government, concerned that such dredging would adversely affect navigation, ordered the dredger to cease operation.  After the dredger complied with this order, the riparian owner brought suit demanding the dredger continue to pay for the right to remove sand. This Court began its analysis by noting that the riparian owner "holds the naked legal title [the *jus privatum*], and with it he takes such proprietary rights as are consistent with the public right of navigation [the *jus publicum*], and the control of congress over that right."  *Id.* at 314 (citation omitted).  Thus, the riparian owner's title is "'held at all times subordinate to such use of the *submerged lands and of the waters flowing over them* as may be consistent with or demanded by the public right of navigation.'"  *Id.* at 310 (emphasis added; citation omitted).  The Court concluded that the dredger was evicted from the river bed by the government, which on the basis of its right to protect navigation had superior title over the riparian owner.  Therefore, the riparian owner was not entitled to further payment after the date of eviction. *Id.* at 318.

Unlike rivers and inland lakes, the state holds both the *jus privatum* and *jus publicum* title to the submerged lands of the Great Lakes.  *Nedtweg, supra*.  In *Nedtweg*, the

state sought to lease several thousand acres of relicted land abutting Lake St. Clair that were considered submerged in law.[50] In order to do so, the Legislature passed legislation authorizing long-term leases of such land to private individuals. The Department of Conservation refused to enter into such leases, arguing that the submerged-in-law land was held in trust for the public and could not be conveyed. We noted that the title to submerged land is bifurcated between the *jus publicum* and the *jus privatum*. *Nedtweg, supra* at 17.

> The State may not, by grant, surrender such public rights any more than it can abdicate the police power or other essential power of government. But this does not mean that the State must, at all times, remain the proprietor of, as well as the sovereign over, the soil underlying navigable waters. [*Id.*]

In other words, the state may convey the *jus privatum* in submerged Great Lakes land, as long as that conveyance does not interfere with the public's "rights of navigation, hunting and fishing." *Id.* at 18. The Court noted that, because the land in question was now dry land, it was no longer suited for the purposes protected by the *jus publicum*. *Id.* at 22. In other words, contrary to the majority's understanding, while the "submerged" lands in

---

[50] *Nedtweg* was decided during the reign of the *Kavanaugh* cases.

question were still *part* of the public trust, the lease was permissible because there was no interference with the *uses* protected by the public trust doctrine.[51]

To summarize, under the common law as it has developed in Michigan, the *jus privatum* is held by either the adjoining property owner (in the case of rivers or inland lakes), or by the state itself (in the case of the Great Lakes). In either case, the *jus privatum* title is held subject to the public's rights under the *jus publicum*. However, the public's *jus publicum* rights are limited to use of the waters themselves. *Lorman, supra; McMorran Milling, supra.* Further, the *jus publicum* only protects the public's right to use private property for specific purposes, such as navigation, fishing, and hunting. *Nedtweg, supra.* There are no cases that support the majority's view that the *jus publicum* extends beyond the water's themselves to include unsubmerged land. *Lorman, supra* at 29. On the Great Lakes, the overlap between *jus privatum* and *jus publicum* would only come into play when the Legislature conveyed a portion of the submerged lands to a third party. Because, as argued previously, the

---

[51] The majority claims that the lands at issue in *Nedtweg* were "set[] apart from the public trust." *Ante* at 27.

61

littoral owner's title never extends past the wet sands, unsubmerged land between the wet sands and the "ordinary high water mark" is simply not, and has never been, part of the *jus publicum.*

## IV. QUESTIONS RAISED BY MAJORITY OPINION

Questions directly raised by the majority's departure from the longstanding status quo in our state include the following:[52]

(1) Are there property tax consequences to the fact that the exclusive rights of littoral property owners would now extend not to the water's edge, but only to the "ordinary high water mark"?

---

[52] The majority maintains that this case "raises none of the questions that [this dissent] poses," while, of course, choosing to answer none of these questions. *Ante* at 44. The majority is mistaken if it believes that it can replace settled law in Michigan with a selective part of the law of another state-- indeed the least clear part of that other state's law-- and create a new legal relationship between littoral property owners and the public, all the while avoiding giving rise to new legal questions and generating litigation. Each of the questions set forth in this section, as well as a great many more that neither I nor the majority can anticipate, will be introduced into the legal system as a direct result of the majority's opinion. This opinion will be subject to cryptanalysis for many years to come and will produce litigation and dispute where up to now there has been none. Perhaps equally troubling, when clarity in the law is once again established in the area of littoral property rights-- many years from now, and only after what is likely to be an unnecessary period of fractiousness and contention-- it will likely come as a function of *administrative determinations of private property rights.*

62

(2) Given that the majority has expanded the lands subject to the public trust doctrine, will there be a corresponding expansion of uses that are considered "inherent in the exercise of traditional public trust uses"?  That is, given that the public trust now encompasses dry land up to at least the "ordinary high water mark," are there new uses of these lands that arguably can be connected to traditional public trust uses?

(3) Given that there are always more members of the public who may wish to use a property in a particular manner than there are property owners, what permanent protections exist to ensure that the Department of Natural Resources, as a political institution, will not seize upon the vagueness and lack of definition of the majority opinion increasingly to broaden the "public trust" at the expense of littoral property rights?

(4) What are the implications of the majority's opinion for the rights of other littoral property owners on lakes other than the Great Lakes, whose properties also afford access to recreational opportunities for the public?

(5) Given the majority's conclusion that "the public trust doctrine serves to protect resources," what are the implications of the majority's opinion for the rights of non-littoral property owners, whose properties abut or have

63

an impact upon state lands used by the public for recreational purposes?

## V. Conclusion

I would not alter the longstanding status quo in Michigan, and I, therefore, dissent. The majority has altered this status quo by: (1) redefining the lands subject to the public trust doctrine on the basis of Wisconsin's definition of the "ordinary high water mark"; and (2) holding for the first time that the use of unsubmerged lands is permitted by the public trust doctrine.

The majority fails to identify any defects in the present rules of this state, rules that have endured since statehood, that would justify its departure from the "water's edge" principle in favor of unclear rules of its own design. The present rules have created a reasonable and harmonious balance between the rights of the public and the rights of littoral property owners. Under these rules, the littoral owner's title follows the shoreline, i.e., where the wet sands give way to the dry sands, wherever this may be from time to time. Because the boundary is dependent on the natural condition of the Great Lakes, it is easily identifiable, thus, creating a practical and workable rule. The public's legal right to use private

64

property along the shores of the Great Lakes should remain, as it has always been, within this realm.

The critical flaw in the majority's decision making is that it creates new law, not on the basis of the millions of amicable interactions that occur each year between the public and lakefront property owners, but instead on the basis of the single aberrational dispute in this case. In the place of a stable and well-understood law that has worked well for more than a century and a half to define the rights of the public and littoral property owners and to minimize litigation, the majority, in reaction to the present dispute, finds it necessary to introduce a range of novel concepts into Michigan property law. Apart from lacking any basis in present Michigan law, these concepts are essentially undecipherable. Thus, in an area of the law in which stability and clarity are paramount, the majority offers rules that are obscure and that will be subject to evolving definition by environmental regulatory agencies. Almost certainly, these new rules, in conjunction with the majority's disinclination to define the critical aspects of these rules, will lead to an escalation in the number of disputes between members of the public and property owners along the Great Lakes. In the

place of harmony, there will be litigation.[53]  In the place of unobstructed beachfront, there will be fences.  Five hundred cases from now, and after the expenditure of enormous litigation costs and legal resources, Michigan, if it is fortunate, will once again reach the state of equilibrium that it enjoys today and that it has enjoyed for many decades under current law.

I would affirm the result of the Court of Appeals, reverse that portion of the Court of Appeals opinion giving

---

[53] In the end, it will not be surprising if the day-to-day rights of the public even to beach-walk-- the ostensible triggering concern of this case-- were to be diminished by the majority's decision.  For, in the place of a rule in which property rights are clearly defined and protected, and in the place of a regime in which most littoral property owners have easily accommodated the public's interest in activities such as beach-walking, the majority creates a far more uncertain rule, one in which property rights have become more ambiguous and uncertain, and more subject to political regulation and definition. Just as some members of the public are likely to become more assertive in their claim of a "right" to use the property of another, so too will some property owners become more assertive in purporting to "defend" their properties from the encroachments of such persons.  At least some of these owners can be expected to assert their property rights in circumstances where today this has been thought unnecessary.  It may well be that a legacy of the majority opinion is the proliferation of fences along the beaches of the Great Lakes.  Fences and more fences.  As a result of the majority's decision to replace clearly understood and longstanding rules of private property rights with new rules in which the public trust is to be expanded in an uncertain manner, the rights of both the public and the property owner will likely become less well protected.

the state title to land below the "ordinary high water mark," and reaffirm the longstanding principle of *Hilt* that the littoral property owner's title extends to unsubmerged land and the public's legal rights under the public trust doctrine extend to the submerged lands, including the wet sands.[54]

Stephen J. Markman

---

[54] Because I agree with the majority that the GLSLA does not establish the boundaries of the public trust, I concur in part II(A) of the majority opinion.